**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOSEPH J. BOOKLESS, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:03 CV 123 (WWE) (HBF) |
| | ) | |
| v. | ) | |
| | ) | |
| RANDY IRELAND, JERRY SCULLY, | ) | March 14, 2006 |
| BART DEELEY, & RAYMOND WALSH, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR RECONSIDERATION**

Plaintiff Joseph J. Bookless submits this memorandum of law in opposition to the Motion for Reconsideration dated March 3, 2006 filed by Defendants Randy Ireland, Jerry Scully, Bart Deeley, and Raymond Walsh. Defendants' motion paints a misleading picture of the facts and circumstances surrounding Plaintiff's renewed discovery request, which was granted by the Court by Order dated February 28, 2006 ("February 28 Order"). Plaintiff's discovery request was not untimely because it renewed an earlier request that was denied in part by the Court by Order dated December 8, 2005 ("December 8 Order"), pursuant to instructions given in the December 8 Order. Moreover, Plaintiff's renewed discovery request will not be prejudicial to Defendants and is supported by good cause.

I.    **Background**

The undersigned informed counsel for Defendants in November 2005 that he would be accepting appointment as pro bono counsel for Plaintiff, following Plaintiff's successful efforts

as an incarcerated pro se litigant to defeat Defendants' summary judgment motion without the benefit of deposition testimony. Having been notified of the pending appointment, counsel for Defendants sent the undersigned a letter dated November 22, 2005 (*see* Ex. A, Letter from James N. Tallberg, Esq. to Howard S. Master, Esq. ("November 22 Letter")), that listed sixteen potential trial witnesses, including Officers Peter Bosco, Robert Allen, and Rick Smolicz, who had not previously been named in Defendants' written disclosures. The undersigned formally accepted appointment as pro bono counsel on December 6, 2005, and participated in a telephonic status conference with counsel for Defendants before the Court on December 8, 2005.

At that status conference, the undersigned, on behalf of Plaintiff, requested the opportunity to depose Defendants and the sixteen witnesses named in the November 22 Letter. The December 8 Order granted the request to depose Defendants, provided that the depositions were conducted before February 27, 2006. It denied the request to depose the sixteen witnesses, but gave Plaintiff the opportunity to renew the request "if plaintiff is able to identify, either through the deposition testimony of defendants or after review of other discovery material, an individual whose deposition is necessary for a specific, articulable purpose . . . ." (December 8 Order at 2.)

Pursuant to the Court's order, Plaintiff proceeded to issue notices of deposition to Defendants for depositions to take place on February 9 and 10, 2006. Plaintiff was informed by counsel for Defendants that Defendant Scully was attending training outside of Connecticut and would not return before the February 27, 2006 deadline established by the Court for the taking of his deposition. Plaintiff agreed to submit a joint request to postpone the deadline for taking Defendant Scully's deposition until March 31, 2006.

Plaintiff took the depositions of Defendants Ireland, Walsh, and Deeley as scheduled. During those depositions, Defendants gave testimony that differed in important respects from

previously-prepared police reports on the incident. Critically for purposes of assessing the instant motion, Defendants Ireland and Walsh asserted that while they were able to gain control over portions of Plaintiff's body, they believed they were at risk because Officers Peter Bosco and Robert Allen were unable to gain control over Plaintiff's left arm. (*See* Ex. B, Deposition of Raymond Walsh ("Walsh Dep."), at 81, 85-88; Ex. C, Deposition of Randy Ireland ("Ireland Dep."), at 49-51, 74-76.) This assertion appears nowhere in the police reports that were prepared of the incident and attached to Plaintiff's Motion to Extend Discovery Deadline and Renew Discovery Request, dated February 23, 2006 ("February 23 Discovery Motion").[1]  Nor did the police reports support Defendant Deeley's statements at his deposition, as described in the February 23 Discovery Motion, that he was unaware of any efforts that were taken by Officer Rick Smolicz to investigate Deeley's use of the police dog against Plaintiff.

Having learned through Defendants' deposition testimony new facts that would indicate the critical importance of Officers Bosco, Allen, and Smolicz to Defendants' case at trial, the February 23 Discovery Motion renewed Plaintiff's request to depose those three witnesses to learn their versions of the incident and any conversations or investigations that followed the incident. That renewed request was granted by Order dated February 28, 2006.

Defendants' motion for reconsideration followed.

## II.   **Argument**

Plaintiff's renewed discovery request was not untimely, will not prejudice Defendants, and is supported by good cause. Thus, it was properly granted by the Court.

---

[1] Contrary to Defendants' assertion that Plaintiff's motion was filed on February 27, 2006, the motion was filed on February 23, 2006 and e-mailed to counsel for Defendants that same day. The filing of the motion was not docketed by the Clerk of Court until February 27, 2006.

Defendants attempt to describe Plaintiff's renewed discovery request as an improper last-minute effort to reopen discovery on the eve of trial. This characterization of the request is inaccurate. Plaintiff initially sought authorization to depose Officers Bosco, Allen, and Smolicz, among other newly-named potential trial witnesses, during a telephone conference with the Court on December 8, 2005, even before a trial date had been set in this matter. That request was initially denied, but the Court stated in its December 8 Order that the request could be renewed if depositions of specified individuals were necessary "for a specific, articulable purpose . . . ." (December 8 Order at 2.) Thus, Defendants have been on notice for several months that Plaintiff was interested in deposing the three officers named in the motion. Immediately after becoming aware of specific reasons why it was necessary to depose Officers Bosco, Allen, and Smolicz, Plaintiff filed the February 23 Discovery Motion. As a result, the depositions will not take place on the "eve of trial." In fact, they will take place before the March 31 deadline for the taking of Defendant Scully's deposition proposed by counsel for Defendants.

It is also inaccurate to describe the sought-after depositions as being prejudicial to Defendants. These depositions will take place more than a month before trial and before the extended deadline for the taking of Defendant Scully's deposition has passed. They will, as Plaintiff represented to the Court in the February 23 Discovery Motion, be brief and focused on matters directly relevant to the upcoming trial of this matter. They will not be cumulative or duplicative, but instead promise to reveal new and relevant information for the reasons described in the February 23 Discovery Motion. The legal fees and transcript costs that would be incurred by Defendants as a result of these brief depositions will be limited, and would be incurred only because Defendants may choose to attend and order transcripts of these third-party depositions, not due to any prejudicial action taken by Plaintiff.

Finally, for the reasons stated in the February 23 Discovery Motion and in further detail above, there is good cause for granting Plaintiff's renewed discovery request. Information obtained only during the recent depositions of Defendants Walsh, Ireland, and Deeley revealed the importance of Officers Bosco, Allen, and Smolicz to Defendants' case at trial. Permitting Plaintiff to depose these officers will enable Plaintiff's pro bono counsel to conduct effective preparations for trial and enable more informed settlement discussions prior to trial.

### III.    Conclusion

For the foregoing reasons, Defendants' motion for reconsideration should be denied.


DATED: March 14, 2006

Howard S. Master (ct26855)
Wiggin and Dana LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508
(203) 498-4400
(203) 782-2889 (fax)
hmaster@wiggin.com

## **CERTIFICATE OF SERVICE**

This is to certify that on this 14th day of March, 2006, a copy of the foregoing has been

mailed, postage prepaid, to the following:

> James N. Tallberg, Esq.
> Karsten & Dorman, LLC
> 29 South Main Street
> West Hartford, CT  06107

Dated: March 14, 2006

_____
Howard S. Master

\17977\1\582728.1

**A**

# Updike, Kelly & Spellacy, P.C. _____ Counselors at Law

Hartford  •  New Haven

One State Street, P.O. Box 231277
Hartford, Connecticut 06123-1277
Telephone (860) 548-2600
Facsimile (860) 548-2680

**╥╥╥ MERITAS**
LAW FIRMS WORLDWIDE

James N. Tallberg
(860) 548-2611
(860) 548-2680 Fax
jtallberg@uks.com

November 22, 2005

Howard S. Master, Esq.
Wiggin & Dana, LLP
265 Church Street
New Haven, CT 06508

Re:    <u>Joseph J. Bookless v. Randy Ireland, et al.</u>
       No. 3:03-CV123(WWE)

Dear Attorney Master:

In my letter to you of November 15, 2005, I referenced an audio tape that I recently obtained regarding the above matter. I have reviewed the discovery requests served by Mr. Bookless and which we responded to on or about March 2, 2004 and it appears that Mr. Bookless did not ask us to produce, or even search for, any audio recordings. I recently obtained this tape as I was preparing the case for trial and attempting to recreate a timeline of events. Although I do not believe I am obligated by any discovery request to provide you with this tape, I am doing so out of an abundance of caution and because I intend to offer it at trial.

In addition, I wish to supplement the defendants' discovery responses of March 2, 2004, as follows. First, Interrogatory Number 10 asked each defendant to identify "any witness to the incident in which the Plaintiff was injured that you intend to call at trial." We responded with an objection, referred to the four defendants, and indicated that since discovery was ongoing we would supplement our witness list at a future date. We then attached all of the relevant police reports, most of which identified a number of police, and non-police witnesses. Again, out of an abundance of caution, and in the spirit of full disclosure, I wish to supplement the defendants' prior discovery responses by informing you that I may call the following witnesses at trial, in addition to the defendants. I believe these witnesses are all identified in the reports and records we previously produced. I doubt I'll call more than a few of these witnesses, but list them all here to be safe.

Officer Jennifer Wilmot
Sgt. Robert Allen
Officer Joshua Bernegger
Officer Peter Bosco
Officer Schoefield
Officer Crosswait
Officer Carline Obar
Sgt. Ricky Smolicz
Captain Thomas Fortin

416604

Updike, Kelly & Spellacy, P.C.

Howard S. Master, Esq.
November 22, 2005
Page 2

Assistant State's Attorney John Davenport
Aynslee Lenktaitis
Donna Grillo
Christina Palumbo
EMT Amendola
EMT Howard
Dr. Robert J. Femia

Lastly, I have enclosed the following items that I recently obtained from the Naugatuck Police Department:

1.   Audio tape of dispatch recordings from 5/22/00

2.   History Report for Incident No. 00-12137 of 5/22/00 – A one page document that shows this call was received at 16:05 and cleared at 16:24.

3.   History Report for Incident No. 00-12143 of 5/22/00 – A one page document that shows an ambulance was called for Mr. Bookless at 17:16 and was cleared at 20:35.

4.   A color copy of the booking sheet related to Mr. Bookless's 5/22/00 arrest, which includes his booking photo.

Please let me know if you need anything else from me. Otherwise, I'll look forward to discussing this further at our December 8 status conference.

Very truly yours,

JAMES N. TALLBERG

JNT/cmb
Enclosures

416604

# HISTORY REPORT

INCIDENT [ 00-12137 ]

DATE [ 05/22/00 ]

WEATHER [ Clear ]

## Complaint

| No | Location | Apt |
|---|---|---|
| 120 | Robbery | |
| 413 | North Main Street | |

### COMPL INFO

First-Last: [ | Unknown ]  Rcvd: [ 16:05 ]
No-Street: [ | ]  Disp: [ 16:07 ]
City-St: Naugatuck [ CT ]  Arrv: [ 16:07 ]
BusnLoc: [ ]  Clrd: [ 16:24 ]
Phone: [ ]

### Patrols [ 2 ]

Pl27 Ireland D-1 C-03 R-26
Pl46 Schofield D-1 C-03 R-21
Pl32 Purcaro D-2 C-06 R-25
Pl38 O'Mara D-3 C-25 R-23
Pl44 DeOliveria D-4 C-04 R-29
Pl34 Bernegger East Back Up C-2 R-19
Pl42 Crosswait West Back Up C-9

XStreet: [ Annadonte's ]

| Asnmt | | Officer | Disp | Arrv | Clrd |
|---|---|---|---|---|---|
| X | pl27 | Ireland | 16:07 | 16:07 | 16:24 |
| | pl28 | Deeley | 16:07 | 16:07 | 16:24 |
| | pl34 | Bernegger | 16:07 | 16:07 | 16:24 |
| | pl30 | Bosco | 16:12 | 16:12 | 16:24 |
| | LT2 | Scully | 16:12 | 16:12 | 16:24 |
| | PL32 | Purcaro | 16:15 | 16:15 | 16:24 |

### Incident Disposition

Action: [ A11 ]
RptReq: [ Yes ]
CorrReq: [ No ]
RecCk: [ RTI ]
Status: [ ]

## Details

**Party displayed knife. Officer's have suspect in custody a Joseph Bookless 8/30/51.**

## Persons Involved

| Key | BKN | Last | First | No | Street | City | St |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Key | BKN | Last | First | Sex | Race | Ethn | DOB | Phn-H | Phn-W |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

# HISTORY REPORT

INCIDENT **00-12143**

DATE **05/22/00**

WEATHER **Clear**

## Complaint

No **15**

Location **Ambulance Call**

Apt

**211**  **Spring Street**

### COMPL INFO

First-Last: **Sgt**  **Smolicz**  Rcvd: **17:15**
No-Street: Disp: **17:16**
City-St: **Naugatuck**  **CT**  Arrv: **17:16**
BusnLoc: Clrd: **20:35**
Phone:

| Asnmt | | Officer | Disp | Arrv | Clrd |
|---|---|---|---|---|---|
| X | Amb | Ambulance | 17:16 | 17:16 | 17:16 |
| | pl27 | Ireland | 17:16 | 17:16 | 20:35 |
| | pl46 | Schofield | 17:16 | 17:16 | 20:35 |
| | | | | | |
| | | | | | |
| | | | | | |

## Patrols  **2**

Pl27 Ireland D-1 C-03 R-26
Pl46 Schofield D-1 C-03 R-21
Pl32 Purcaro D-2 C-06 R-25
Pl38 O'Mara D-3 C-25 R-23
Pl44 DeOliveria D-4 C-04 R-29
Pl34 Bernegger East Back Up C-2 R-19
Pl42 Crosswait West Back Up C-9

XStreet: **Naug Police Dept.**

## Incident Disposition

Action: **A21**

RptReq: **No**

CorrReq: **No**

RecCk:

Status: **nrn**

## Details

**Prisoner Joseph Bookless 8/30/51, with injury. Left HQ for hospital at 17:37 hrs. Arrived at hospital at 17:50 hrs.**

## Persons Involved

| Key | BKN | Last | First | No | Street | City | St |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| Key | BKN | Last | First | Sex | Race | Ethn | DOB | Phn-H | Phn-W |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NO. 3:03 CV123 (WWE)


- - - - - - - - - - - - - - - - - -X
JOSEPH BOOKLESS,                     :
                    PLAINTIFF        :
                                     :
VS.                                  :
                                     :
RANDY IRELAND; JERRY SCULLY;         :
BART DEELEY; AND RAYMOND WALSH,      :
                    DEFENDANTS       :
- - - - - - - - - - - - - - - - - -X



              Deposition of RAYMOND WALSH
        taken at the offices of Wiggin & Dana, One
        Century Tower, New Haven, Connecticut
        06508, before Clifford Edwards, LSR,
        Connecticut License No. SHR.407, a
        Professional Shorthand Reporter and Notary
        Public, in and for the State of
        Connecticut on February 9, 2006, at
        10:19 a.m.




           DEL VECCHIO REPORTING SERVICES, LLC
            PROFESSIONAL SHORTHAND REPORTERS
                   117 RANDI DRIVE

                 MADISON, CT  06443


       HARTFORD          NEW HAVEN          STAMFORD

Page 78

12:04:39 1    A    I -- I would assume I would have.

12:04:43 2    Q    Do you remember seeing it there?

12:04:44 3    A    No.

12:04:45 4    Q    Okay. Let's go back to the point where

12:04:54 5    Argot is on Mr. Bookless.

12:04:57 6         You said you kept hold of Mr. Bookless's

12:05:00 7    arm; is that correct?

12:05:01 8         MR. TALLBERG: Object to the form.

12:05:02 9    BY MS. VALENTINE:

12:05:03 10    Q    Did you keep hold of Mr. Booklet's arm?

12:05:06 11         MR. TALLBERG: Object to form.

12:05:07 12    A    Yes.

12:05:08 13    BY MS. VALENTINE:

12:05:08 14    Q    And where was Argot in relation to your

12:05:10 15    body?

12:05:12 16    A    Behind me.

12:05:13 17    Q    He came in from behind you?

12:05:16 18    A    Correct.

12:05:16 19    Q    And were you afraid?

12:05:18 20    A    Of what?

12:05:20 21    Q    Of being next to Argot.

12:05:21 22    A    No.

12:05:22 23    Q    Had you been in that situation, a similar

12:05:26 24    situation before where a canine was used and you

12:05:29 25    were --

Page 79

12:05:30 1    A    No.

12:05:30 2    Q    This was -- was this your first arrest

12:05:34 3    where a canine was used?

12:05:37 4         MR. TALLBERG: Object to the form.

12:05:42 5    A    I don't know.

12:05:45 6    BY MS. VALENTINE:

12:05:54 7    Q    Did you understand why Argot had been

12:05:56 8    released at that time?

12:06:02 9         MR. TALLBERG: Object to the form.

12:06:04 10    A    I don't know if it was me to understand.

12:06:08 11    I just know that that's what was done.

12:06:10 12    BY MS. VALENTINE:

12:06:10 13    Q    Did you -- do you have an opinion, though,

12:06:13 14    as to why that was happening?

12:06:15 15         MR. TALLBERG: Object to the form.

12:06:20 16    A    My opinion?

12:06:22 17         Because what we were doing didn't work.

12:06:25 18    BY MS. VALENTINE:

12:06:25 19    Q    What you were doing didn't work.

12:06:28 20         Do you mean what you were doing to control

12:06:37 21    Mr. Bookless?

12:06:38 22    A    Correct.

12:06:39 23    Q    And what do you mean by "it didn't work"?

12:06:42 24    A    We weren't able to accomplish our goal in

12:06:45 25    getting him handcuffed.

Page 80

12:06:47 1    Q    Were you able to keep him laying face

12:06:50 2    down?

12:06:51 3    A    Yes, for the most part.

12:06:53 4    Q    When you say "for the most part," to what

12:06:56 5    extent were you not able to?

12:06:59 6    A    Well, aside his flopping around and moving

12:07:02 7    back and forth and wiggling to stop everything, it

12:07:06 8    was we were trying to do.

12:07:08 9         I mean, for the most part, he stayed face

12:07:12 10    down.

12:07:12 11    Q    A side of his body you mean was wiggling?

12:07:17 12         MR. TALLBERG: Object to the form.

12:07:18 13    A    Repeat the whole question.

12:07:19 14    BY MS. VALENTINE:

12:07:20 15    Q    You said a side was wiggling around.

12:07:23 16         Or I heard you say --

12:07:23 17    A    Aside from the fact that he was --

12:07:24 18    Q    Oh, aside from the fact that he was

12:07:26 19    wiggling around?

12:07:27 20    A    -- wiggling around.

12:07:30 21    Q    Was he able to rise up off of the ground?

12:07:33 22    A    To what point?

12:07:34 23         He never got to stand.

12:07:36 24    Q    That's what I'm asking.

12:07:37 25    A    No.

Page 81

12:07:38 1    Q    Was he able to get himself 6 inches off

12:07:41 2    the ground at any point?

12:07:43 3    A    I don't know. I don't know.

12:07:44 4         I'm not worried about how hard -- how far

12:07:49 5    he got off the ground. I was worried about keeping

12:07:52 6    his arm under control.

12:07:54 7    Q    And you were able to do that?

12:07:58 8    A    Yes.

12:07:59 9    Q    So if you were able to control his arm,

12:07:59 10    where was the failure in the control if it wasn't on

12:08:02 11    the right arm?

12:08:04 12         MR. TALLBERG: Object to the form.

12:08:06 13    A    On the left arm.

12:08:06 14    BY MS. VALENTINE:

12:08:07 15    Q    On the left arm?

12:08:08 16    A    Can't cuff one hand.

12:08:09 17    Q    So as you remember it, there was no

12:08:11 18    control of the left arm?

12:08:13 19    A    Correct.

12:08:17 20    Q    Was there control over his legs?

12:08:21 21         MR. TALLBERG: Object to the form.

12:08:23 22    A    At what point in time?

12:08:26 23    BY MS. VALENTINE:

12:08:27 24    Q    Once you arrived.

12:08:33 25    A    I don't know. I don't believe so.

21 (Pages 78 to 81)

6b97deb2-5732-4d3b-a5c3-bf8b73820c14

Page 82

12:08:36  1    That's what kept him still wiggling
12:08:39  2  around.
12:08:39  3    Q    At the point that Argot was used, was
12:08:41  4  there control over his legs?
12:08:44  5    A    I don't know.
12:08:44  6    I wasn't worrying about that part of his
12:08:47  7  body.
12:08:50  8    Q    Was he able ever to get up onto his knees?
12:08:54  9    A    Not that I remember.
12:08:55 10    Q    Was he able ever to kick?
12:09:00 11    MR. TALLBERG:  Object to the form.
12:09:05 12    A    Define "kick."
12:09:08 13    He was thrashing around.  I mean, kicking
12:09:11 14  his feet, wiggling around, trying to move, trying
12:09:16 15  not to let us cuff him.  If that's what you mean by
12:09:20 16  kicking.
12:09:20 17  BY MS. VALENTINE:
12:09:20 18    Q    Did you ever hear -- when you say "trying
12:09:21 19  not to let us cuff him," did he ever say anything to
12:09:25 20  that effect?
12:09:26 21    A    Not that I remember.
12:09:58 22    Q    Did you -- with Argot, did you think it
12:10:08 23  was necessary to use Argot?
12:10:10 24    MR. TALLBERG:  Object to form.
12:10:11 25    And I'll object on the basis that it

Page 83

12:10:14  1  calls for a legal conclusion.
12:10:23  2    A    We needed to do something.
12:10:25  3    If you're asking me for my opinion, it
12:10:28  4  helped get us what we needed to accomplish and
12:10:31  5  that's get him handcuffed.
12:10:33  6  BY MS. VALENTINE:
12:10:33  7    Q    And why do you think it helped?
12:10:39  8    A    It made Mr. Bookless give up.
12:10:43  9    Q    Mr. Bookless calmed down?
12:10:46 10    A    Correct.
12:10:47 11    Q    In what way?
12:10:48 12    A    I don't know what made him.  I don't know.
12:10:52 13  It just -- it worked.
12:10:53 14    Q    Was he moving less?
12:10:55 15    A    Yes.
12:10:55 16    Q    Was he talking less?
12:10:56 17    A    I don't remember if he was -- what he was
12:10:59 18  saying or talking or anything as far as verbiage
12:11:04 19  goes.  I don't know.
12:11:06 20    Q    And when did Mr. Bookless calm down?
12:11:10 21    Was it before Argot was released?
12:11:13 22    MR. TALLBERG:  Object to the form.
12:11:14 23    A    I don't know what you mean by "released."
12:11:17 24  BY MS. VALENTINE:
12:11:17 25    Q    There came a point where Argot was pulled

Page 84

12:11:20  1  off or commanded off?
12:11:22  2    A    Off of him.  Then he calmed down.
12:11:26  3    Q    Then he calmed down?
12:11:27  4    A    Yes.
12:11:29  5    Q    Did you have other alternative ways of
12:11:33  6  calming Mr. Bookless down?
12:11:38  7    MR. TALLBERG:  Object to the form.
12:11:43  8    A    Well, what we were doing didn't work.  I
12:11:48  9  don't know.
12:11:49 10  BY MS. VALENTINE:
12:11:50 11    Q    And how were you -- how would you describe
12:11:52 12  the things -- when you say "what we were doing,"
12:11:55 13  what were those things?
12:11:57 14    A    Between everyone trying to talk to him and
12:12:00 15  tell him all we wanted to do was cuff him and give
12:12:05 16  us his hand out of from under his belly and, you
12:12:08 17  know, his waistband area and he didn't want to know
12:12:12 18  nothing about that.
12:12:13 19    Q    So it was talking?
12:12:15 20    A    Yeah.
12:12:15 21    Q    Were you using any hand techniques?
12:12:18 22    MR. TALLBERG:  Objection.
12:12:19 23    Asked and answered.  He's testified
12:12:23 24  at length about where his hands were.
        25

Page 85

12:12:24  1  BY MS. VALENTINE:
12:12:25  2    Q    Were other officers in contact using hand
12:12:29  3  techniques in trying to get Mr. Bookless?
12:12:34  4    A    I have no idea what they were trying to do
12:12:37  5  to try to get his left hand out.
12:12:42  6    Q    What else were you carrying with you that
12:12:45  7  day in terms of weapons on your person?
12:12:50  8    A    In terms of weapons?  My handgun.
12:12:56  9    Q    Your handgun.
12:12:58 10    Would you have been carrying any spray?
12:13:01 11    A    At that time, no.
12:13:05 12    Q    What about a baton?
12:13:05 13    A    No.
12:13:06 14    Q    Did you ever unholster your weapon?
12:13:12 15    A    No.
12:13:13 16    Q    Did you ever consider unholstering your
12:13:16 17  weapon?
12:13:16 18    A    No.
12:13:16 19    Q    And was there a reason you didn't think a
12:13:19 20  weapon was necessary?
12:13:21 21    MR. TALLBERG:  Object to form.
12:13:22 22    A    For me?
12:13:23 23  BY MS. VALENTINE:
12:13:23 24    Q    Yeah.
12:13:26 25    A    Because I had control of his arm.

22  (Pages 82 to 85)

6b97deb2-5732-4d3b-a5c3-bf8b73820c14

Page 86

```
12:13:28  1       Q   You testified when you first arrived,
12:13:29  2   Lieutenant Scully had his gun out?
12:13:32  3       A   Correct.
12:13:33  4       Q   Do you know at what time he reholstered
12:13:37  5   his weapon?
12:13:37  6       A   No, I don't.
12:13:38  7       Q   Do you remember seeing him do it?
12:13:40  8       A   No.
12:13:41  9       Q   Do you remember seeing any other officers
12:13:43 10   who had their weapons out?
12:13:45 11       A   No.
12:13:45 12       Q   Do you remember seeing any officers
12:13:47 13   kicking Mr. Bookless during the struggle?
12:13:50 14       A   No.
12:13:52 15       Q   Do you remember seeing any officers
12:13:52 16   punching Mr. Bookless during the struggle?
12:13:55 17       A   No.
12:13:56 18       Q   Do you remember seeing any officers
12:13:59 19   pushing Mr. Bookless's face into the ground?
12:14:03 20       A   No.
12:14:03 21       Q   Did you ever have contact with
12:14:06 22   Mr. Bookless's face?
12:14:08 23       A   No.
12:14:08 24       Q   Did you ever have contact with any other
12:14:11 25   parts of him besides his right arm?
```

Page 87

```
12:14:16  1       A   No.
12:14:16  2       Q   When you brought his hand behind him to be
12:14:22  3   cuffed, from how far of a distance did you have to
12:14:26  4   move his arm at that point?
12:14:28  5       A   Just bend it at the elbow so it would go
12:14:31  6   in that direction.
12:14:33  7       Q   Bend it at the elbow.
12:14:36  8           So when he was cuffed, about where on his
12:14:38  9   back were his hands?
12:14:41 10       A   Lower back.
12:14:42 11       Q   Lower back.
12:14:58 12           Was Mr. Bookless trying to resist Argot
12:15:01 13   when Argot was on him?
12:15:04 14           MR. TALLBERG:  Object to form.
12:15:11 15       A   I don't know.
12:15:12 16           I mean, how -- I don't know how he would
12:15:15 17   have resisted Argot.  I don't know.
12:15:17 18   BY MS. VALENTINE:
12:15:17 19       Q   Did you feel a difference in the way that
12:15:20 20   Mr. Bookless was trying to move his right arm?
12:15:23 21       A   I don't remember.
12:15:24 22       Q   Do you remember if he was trying to move
12:15:26 23   his right arm?
12:15:28 24       A   He was trying --
12:15:30 25           MR. TALLBERG:  Object to form.
```

Page 88

```
12:15:32  1       A   Sorry.
12:15:32  2           He was trying constantly to move his right
12:15:34  3   arm.  That's why I concentrated so hard on not
12:15:37  4   letting him move it.
12:15:37  5   BY MS. VALENTINE:
12:15:37  6       Q   Did you maintain control during the time
12:15:40  7   in which Argot was biting Mr. Bookless?
12:15:44  8           MR. TALLBERG:  Objection to form.
12:15:47  9   BY MS. VALENTINE:
12:15:48 10       Q   Control of the right arm?
12:15:49 11       A   Yes.
12:16:00 12       Q   I'd like to just talk quickly about
12:16:03 13   situations where you may have been on a scene where
12:16:06 14   a dog was used prior.
12:16:09 15           Do you remember prior to 2000 if you had
12:16:12 16   been involved in an arrest where a canine had been
12:16:16 17   used?
12:16:17 18           MR. TALLBERG:  Object to form.
12:16:18 19           If you could perhaps specify what you
12:16:21 20   mean by "a dog was used."
12:16:24 21   BY MS. VALENTINE:
12:16:25 22       Q   In which a dog was used to control, help
12:16:29 23   control a struggling suspect.
12:16:31 24       A   I don't remember.  I don't think I was.
12:16:46 25       Q   Are you familiar with the circumstances
```

Page 89

```
12:16:50  1   under which a dog should be used to bite a person?
12:16:55  2           MR. TALLBERG:  Object to form.
12:16:56  3       A   No.
12:16:57  4   BY MS. VALENTINE:
12:17:49  5       Q   Once Mr. Bookless was cuffed, what did you
12:17:52  6   do?
12:17:53  7       A   Stood up and backed off.
12:17:56  8       Q   And once he was put in the car, what did
12:17:58  9   you do?
12:17:59 10       A   Continued the investigation on what my
12:18:02 11   jobs were to do.
12:18:04 12       Q   And what was -- what did that entail?
12:18:08 13       A   Interview the complainants, take
12:18:12 14   statements.
12:18:13 15           I remember showing a photo I.D. -- a photo
12:18:17 16   lineup, I'm sorry.
12:18:21 17       Q   And did you do that in the lot?
12:18:23 18       A   No.
12:18:24 19       Q   So what actions did you take?
12:18:25 20           So Mr. Bookless was in the cruiser, and
12:18:27 21   then you got back in your cruiser?
12:18:29 22       A   I don't remember exactly what took place
12:18:33 23   so shortly after.  I know that he was driven to the
12:18:37 24   police department.
12:18:38 25           I don't know.  I would just be guessing on
```

23  (Pages 86 to 89)

6b97deb2-5732-4d3b-a5c3-bf8b73820c14

C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
NO. 3:03 CV123 (WWE)


- - - - - - - - - - - - - - - - - -X
JOSEPH BOOKLESS,                  :
                 PLAINTIFF        :
                                  :
VS.                               :
                                  :
RANDY IRELAND; JERRY SCULLY;      :
BART DEELEY; AND RAYMOND WALSH,   :
                 DEFENDANTS       :
- - - - - - - - - - - - - - - - - -X




Deposition of RANDY IRELAND,
taken at the offices of Wiggin & Dana,
One Century Tower, New Haven, Connecticut
06508, before Clifford Edwards, LSR,
Connecticut License No. SHR.407, a
Professional Shorthand Reporter and Notary
Public, in and for the State of
Connecticut on February 9, 2006, at
2:03 p.m.




DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE

MADISON, CT  06443


HARTFORD          NEW HAVEN          STAMFORD

Page 46

```
14:52:34  1   to get up.
14:52:35  2        Q   Did he get on the his knees?
14:52:37  3        A   No, because those guys had his shoulders
14:52:42  4   pinned to the ground.
14:52:46  5        Q   So --
14:52:47  6        A   You know, with Scully.
14:52:49  7        Q   How was he able to move his feet, his
14:52:52  8   legs?
14:52:52  9        A   He had free reign to move his legs at that
14:52:56 10   point.
14:52:57 11        Q   You just said he was trying to get up.
14:52:59 12   I'm just trying to -- how was he trying to get up?
14:53:04 13            MR. TALLBERG:  Object to form.
14:53:06 14            You can answer.
14:53:07 15   BY MS. AMANKULOR:
14:53:07 16        Q   What was he doing that made you think he
14:53:11 17   was trying to get up?
14:53:13 18        A   Moving his legs.  It appeared that he was
14:53:15 19   trying to get them underneath him.  You know, trying
14:53:19 20   to get to his knees so that he would have more
14:53:23 21   leverage to push, to get up.
14:53:26 22        Q   Was he able to get to his knees?
14:53:28 23        A   No.
14:53:29 24            MR. TALLBERG:  Objection.  Asked and
14:53:30 25        answered.
```

Page 47

```
14:53:31  1   BY MS. AMANKULOR:
14:53:31  2        Q   Sorry.  When you arrived, did you hear any
14:53:34  3   of the officers saying anything?
14:53:40  4        A   Everybody that I could tell was yelling at
14:53:43  5   him to, "Stop resisting."  "Give us your hands."
14:53:46  6   You know, to I -- I don't know, "Relax."  I mean,
14:53:51  7   there was a lot going on at that point, you know.
14:53:54  8        I know when I start engaging a person who
14:54:01  9   is actively trying to get away, my phrase is
14:54:04 10   usually, you know, "Stop resisting."  It's a phrase
14:54:09 11   that's taught to us.
14:54:11 12        You know, there's no way for anybody to
14:54:14 13   not know that, you know, we're looking at you as
14:54:17 14   you're fighting with us and you need to stop.
14:54:20 15        Q   Did you hear if Mr. Bookless said
14:54:22 16   anything?
14:54:23 17        A   At one time I did hear him say that he
14:54:26 18   couldn't breathe.
14:54:27 19        Q   At what point did you hear that?
14:54:29 20        While you were approaching?
14:54:31 21        A   No.  That was after I had already applied
14:54:33 22   the -- the pain-compliant thing to his feet -- to
14:54:39 23   his foot.
14:54:40 24        Q   Okay.  So let's just go back in time a
14:54:43 25   little bit.
```

Page 48

```
14:54:44  1        You get out of your car and you start
14:54:47  2   approaching the scene, and what do you do?
14:54:49  3        A   I run over to where they are.
14:54:51  4        Q   And why did you do that?
14:54:53  5        A   Because he was actively fighting with
14:54:56  6   other officers.
14:54:56  7        Q   Did you receive any commands from anybody
14:55:00  8   that is senior to you?
14:55:02  9        A   You don't have to at that point.  I mean,
14:55:04 10   you're going to help; you're not just going to stand
14:55:08 11   around and watch officers fight with somebody and
14:55:12 12   not help them.
14:55:13 13        Q   What was the first thing you did?
14:55:15 14        A   I ran over.  I saw he was trying to get
14:55:17 15   up.  I saw that he was trying to kick.  I grabbed
14:55:21 16   his foot and went right down into the pain-compliant
14:55:26 17   hold.
14:55:29 18        Q   Did you try to keep his foot down before
14:55:34 19   applying the pain compliance, or was that the very
14:55:39 20   first thing you did?
14:55:41 21        A   I don't know.  I may have went across his
14:55:43 22   legs to stop him, and then it's just a natural move
14:55:46 23   for us to go into the pain-compliant hold from
14:55:50 24   there.  It's what we're -- how we're trained, you
14:55:56 25   know.
```

Page 49

```
14:55:56  1        Q   So where were your hands -- where did you
14:55:59  2   first put your hands when you saw -- when you
14:56:02  3   approached Mr. Bookless?
14:56:04  4            MR. TALLBERG:  Object to the form.
14:56:06  5        A   I honestly don't remember exactly where I
14:56:09  6   put my hands when I first approached.  I can only
14:56:12  7   tell you that I ended up in that hold.
14:56:17  8   BY MS. AMANKULOR:
14:56:17  9        Q   And how did Mr. Bookless respond when you
14:56:21 10   did the pain-compliance technique?
14:56:24 11        A   It didn't appear to have any effect on
14:56:27 12   him.
14:56:28 13        Q   What -- can you -- did he continue
14:56:32 14   kicking?
14:56:33 15        A   He still tried but, I mean, by that time,
14:56:36 16   I have one foot locked up.  You know, he's only got
14:56:42 17   another foot that he can use and, if I did it
14:56:49 18   correctly, which I believe I did, I would toss my
14:56:52 19   other foot around that to stop that so it would lock
14:56:56 20   up his legs so he couldn't kick anymore.
14:57:00 21        You know what I mean?
14:57:02 22        Q   So after you applied the technique, he was
14:57:06 23   no longer kicking?
14:57:08 24        A   At that point --
14:57:09 25            MR. TALLBERG:  Object to the form.
```

Del Vecchio Reporting
(203) 245-9583

a18c70ed-d9c7-4bcf-951e-f0032276963d

Page 50

14:57:11  1        You can answer.
14:57:11  2     A   At that point, he's not kicking because
14:57:16  3  I've got his legs restrained.
14:57:18  4  BY MS. AMANKULOR:
14:57:18  5     Q   Both his legs?
14:57:21  6     A   I believe so, yes.
14:57:27  7  It was five and a half years ago.
14:57:32  8     Q   How do you know that Mr. Bookless didn't
14:57:35  9  respond in any way?
14:57:37 10     A   Because he was still actively fighting the
14:57:39 11  officers on his arms.
14:57:44 12     Q   Did he say anything?
14:57:46 13     A   Like I said, I heard him say, "I can't
14:57:48 14  breathe," to let him up.
14:58:15 15     Q   Okay.  So did you hear -- you didn't hear
14:58:20 16  Mr. Bookless say anything when you applied the pain
14:58:23 17  compliance?
14:58:25 18     A   No.
14:58:27 19     Q   Nothing about his motions changed when you
14:58:29 20  applied the --
14:58:31 21     A   No.  The only thing that stopped --
14:58:37 22        MR. MASTER:  Go ahead.
14:58:38 23     A   The only thing that stopped was that I was
14:58:41 24  able to gain control of his legs.  I mean, he was
14:58:44 25  still trying to move his legs but, I mean --

Page 51

14:58:47  1  BY MS. AMANKULOR:
14:58:48  2     Q   Can you explain exactly how you were able
14:58:50  3  to maintain control of both of his legs?
14:58:54  4        MR. TALLBERG:  Object to the form.
14:58:55  5        You can answer.
14:58:56  6     A   Because my weight was on top of his legs
14:58:58  7  on top -- and I had one foot in my hand -- in my
14:59:04  8  hands.
14:59:04  9  BY MS. AMANKULOR:
14:59:04 10     Q   Were you able to maintain control the
14:59:06 11  entire time?
14:59:07 12        MR. TALLBERG:  Object to the form.
14:59:09 13     A   As best I could.
14:59:10 14  BY MS. AMANKULOR:
14:59:11 15     Q   Were you able to maintain control until
14:59:15 16  Mr. Bookless was handcuffed?
14:59:18 17     A   I stayed on his legs until he was
14:59:20 18  handcuffed, yes.
14:59:21 19     Q   Did Mr. Bookless try to resist your hold?
14:59:28 20        MR. TALLBERG:  Object to the form.
14:59:31 21        You can answer it.
14:59:32 22     A   I would assume, yes, where he was still
14:59:35 23  trying to move his legs, you know.
14:59:38 24  BY MS. AMANKULOR:
14:59:39 25     Q   Was he still trying to move his legs?

Page 52

14:59:42  1     A   Yes.
14:59:42  2     Q   How could you tell?
14:59:44  3     A   How could I tell?  Just like how you could
14:59:48  4  tell if somebody is tightening up on you, you feel
14:59:51  5  the push and pull of the legs, you feel the movement
14:59:55  6  of the legs.
14:59:56  7        I mean, no matter if somebody tries to pin
14:59:59  8  you down totally, you're not going to restrict
15:00:02  9  somebody's movements 100 percent unless they're
15:00:06 10  compliant.
15:00:13 11     Q   How far did you twist his ankle?
15:00:18 12     A   I pretty much -- it's just a quick snap.
15:00:26 13  It's, you know, you basically tweak the ankle until
15:00:33 14  you get resistance.  I mean, some people, it may be
15:00:37 15  two or three inches.
15:00:39 16        Other people might be a half inch.  I
15:00:42 17  don't recall exactly on him how far I twisted.  I
15:00:45 18  twisted until I felt, you know, you couldn't -- you
15:00:49 19  can't go any further and then --
15:00:52 20     Q   And how many degrees would that be?
15:00:54 21        Can you --
15:00:54 22     A   It varies on everybody.
15:00:57 23     Q   And you have no recollection of how many
15:00:59 24  degrees you twisted?
15:01:02 25     A   No.

Page 53

15:01:02  1     Q   Did you hear anything pop?
15:01:05  2     A   No.
15:01:05  3     Q   Did he scream?
15:01:06  4     A   No.
15:01:15  5     Q   When you got no response did you continue
15:01:18  6  twisting?
15:01:18  7     A   No.  I just held it there.
15:01:20  8     Q   How did you know that you had control?
15:01:25  9        MR. TALLBERG:  Object to the form.
15:01:28 10        I'm not sure he testified that he had
15:01:31 11  control.
15:01:31 12        But you can answer if you understand.
15:01:37 13  BY MS. AMANKULOR:
15:01:37 14     Q   How did you know that you had twisted his
15:01:40 15  ankle far enough?
15:01:41 16     A   Because there was resistance.
15:01:45 17     Q   And what does that mean?
15:01:47 18     A   Resistance?  It means that your foot
15:01:50 19  doesn't go any further.
15:01:53 20     Q   Okay.  And at this point that you had
15:01:55 21  him -- his ankle in a -- his legs in a hold, what
15:02:06 22  were the other officers doing?
15:02:08 23     A   Still trying to maintain control of his
15:02:10 24  arms, get control of his other arm.  The fight just
15:02:15 25  continued.

14  (Pages 50 to 53)

a18c70ed-d9c7-4bcf-951e-f0032276963d

Page 54

```
15:02:20  1          MR. TALLBERG:  Want to take a break?
15:02:22  2          THE WITNESS:  No.
15:02:23  3   BY MS. AMANKULOR:
15:02:23  4      Q   What was the position of Officer Walsh?
15:02:28  5          MR. TALLBERG:  Objection to the form.
15:02:30  6      Could you be more specific?
15:02:32  7          MS. AMANKULOR:  Sure.
15:02:32  8   BY MS. AMANKULOR:
15:02:33  9      Q   While you -- at the time you had
15:02:34 10   Mr. Bookless's legs in a hold, what position was
15:02:39 11   Detective Walsh in?
15:02:42 12      A   What position was he in?
15:02:44 13      Q   Was he standing?
15:02:45 14      A   I don't recall if he's standing or if he
15:02:48 15   was on his knees.  I don't recall.
15:02:51 16      Q   Do you remember if he was grabbing
15:02:53 17   Mr. Bookless?
15:02:55 18      A   I remember he was -- had his arm.  I mean,
15:03:00 19   I don't remember if he maintained total control over
15:03:05 20   it.  I had my own problems going on the lower
15:03:08 21   extremities of Mr. Bookless.
15:03:11 22      Q   And where is -- and at the time that you
15:03:15 23   had the hold on Mr. Bookless's legs, where was
15:03:20 24   Lieutenant Scully?
15:03:20 25      A   He was repositioning himself.  I remember
```

Page 55

```
15:03:27  1   that.  I mean, there was nobody that stayed in just
15:03:31  2   one position.  I mean, everybody was trying to get
15:03:35  3   where they could get Bookless's hands and handcuff
15:03:41  4   him so that the fight would be over.
15:03:43  5      Q   But what positions was he moving?
15:03:45  6      I mean, where was he?
15:03:46  7      Was he --
15:03:47  8      A   I honestly don't remember.  You would have
15:03:52  9   to ask Lieutenant Scully.
15:03:57 10          MR. TALLBERG:  Could we maybe take a
15:03:57 11      break at this point?
15:04:03 12          MR. MASTER:  Sure.
15:04:04 13          MR. TALLBERG:  We've been going about
15:04:09 14      an hour.
15:04:11 15          MR. MASTER:  Sure.
15:04:11 16          (THEREUPON, THERE WAS A RECESS
15:04:11 17      TAKEN.)
15:11:13 18   BY MS. AMANKULOR:
15:11:17 19      Q   Okay.  Let's go back to the point in time
15:11:20 20   right after you had put a hold on each of
15:11:24 21   Mr. Bookless's legs.
15:11:30 22          MR. TALLBERG:  Object to the form.
15:11:31 23   BY MS. AMANKULOR:
15:11:31 24      Q   I haven't finished my question.
15:11:37 25      Immediately after you had taken ahold of
```

Page 56

```
15:11:42  1   Mr. Bookless's legs, what were the other officers
15:11:46  2   doing?
15:11:47  3          Specifically, what was Lieutenant Scully
15:11:50  4   doing?
15:11:53  5      A   You would have to ask Lieutenant Scully.
15:11:56  6      I mean, I -- everything was going on so
15:12:00  7   quick.
15:12:01  8      Q   You don't remember seeing him?
15:12:03  9      A   Oh, I remember seeing him.  I don't
15:12:05 10   remember seeing him at the exact point in time that
15:12:08 11   you're seeing me though.  You know, I don't know if
15:12:11 12   he was standing.  I don't know if he was holstering
15:12:15 13   his weapon at that point, you know?
15:12:16 14      I mean, at that point, I'm, like Detective
15:12:18 15   Walsh, you know, I'm concentrating on my job of
15:12:23 16   trying to keep his legs under control.
15:12:26 17      Q   And the other officers, Bosco and Allen?
15:12:31 18      A   They're, from what I remember, they're
15:12:34 19   still trying to get his arm out from underneath him.
15:12:38 20      Q   How do you know that?
15:12:40 21      A   Because I'm right there.  I mean, I see
15:12:43 22   him -- I remember seeing him on an arm.  I remember
15:12:49 23   seeing Lieutenant Scully near the head.  I mean --
15:12:52 24          MR. TALLBERG:  For the record, the
15:12:54 25      officer is pointing towards Detective
```

Page 57

```
15:12:56  1   Walsh.
15:12:59  2      A   I remember Bosco and Sergeant Allen
15:13:06  3   fighting with him up until the point where Argot
15:13:11  4   came into it.  I mean, I don't know what else you're
15:13:14  5   looking for here.
15:13:16  6   BY MS. AMANKULOR:
15:13:16  7      Q   Can you just describe what they were doing
15:13:18  8   so that you knew they were trying to get to his left
15:13:22  9   arm?
15:13:23 10      A   I remember them keep on telling him to
15:13:32 11   give up his arm, give up his arm, and trying to pull
15:13:36 12   it from underneath him.
15:13:38 13      Q   Were the officers saying anything else?
15:13:41 14      A   I remember myself saying, "Stop
15:13:43 15   resisting," you know.  You know, I mean, it was all
15:13:47 16   going on so quick.
15:13:48 17      Q   Did you hear Mr. Bookless say anything?
15:13:51 18      A   As I said before, the only thing I
15:13:54 19   remember him saying was, "I can't breathe."
15:13:56 20      Q   Do you remember at what point he said
15:13:59 21   that?
15:14:01 22      A   That was before Argo hit.
15:14:05 23      Q   Did he say it more than once?
15:14:07 24      A   No.  I only remembered him saying it once
15:14:12 25   But, I mean, it's -- it's been my experience that if
```

15 (Pages 54 to 57)

a18c70ed-d9c7-4bcf-951e-f0032276963d

Page 74

15:31:54 1  station what did you do?
15:31:56 2      A   We processed him.
15:32:04 3          MS. AMANKULOR:  Can we take a break
15:32:05 4      actually for a second?
15:32:09 5          MR. MASTER:  Sure.
15:32:24 6          (THEREUPON, THERE WAS A RECESS
15:32:24 7      TAKEN.)
15:40:47 8  BY MS. AMANKULOR:
15:40:52 9      Q   I just want to go back for a second just
15:40:55 10 to clarify some things for myself if that's okay
15:40:59 11 with you.
15:41:00 12     A   Okay.
15:41:00 13     Q   Back to before Argo bit Mr. Bookless you
15:41:07 14 testified that you had his legs, Officer Scully --
15:41:14 15 Lieutenant Scully was somewhere on him, you're
15:41:17 16 unclear where, and then Detective Walsh had his
15:41:24 17 right arm, was on his right arm, and Officers Allen
15:41:28 18 and Bosco were on his left arm.
15:41:31 19         Now, I just want to concentrate a little
15:41:34 20 bit on the left arm.
15:41:36 21         MR. TALLBERG:  Object to the form,
15:41:37 22     but please proceed.
15:41:40 23 BY MS. AMANKULOR:
15:41:40 24     Q   Why were Officers Allen and Bosco unable
15:41:44 25 to restrain Mr. Bookless's left arm from what you

Page 75

15:41:50 1  could see?
15:41:52 2      A   Why were they unable to?
15:41:57 3      Q   Uh-huh.
15:41:59 4      A   Have you ever tried to move somebody's arm
15:42:04 5  after they have locked it into position?
15:42:07 6          It's not easy to remove somebody's arm
15:42:11 7  when they don't want it to be removed.
15:42:13 8      Q   So where exactly was Mr. Bookless's arm at
15:42:17 9  this point?
15:42:18 10         MR. TALLBERG:  Objection.
15:42:19 11     His left arm?
15:42:20 12         MS. AMANKULOR:  Sorry.  Yes.
15:42:22 13     A   His left arm would still be underneath
15:42:24 14 him.
15:42:24 15 BY MS. AMANKULOR:
15:42:25 16     Q   So where were they grabbing him on his
15:42:28 17 arm?
15:42:29 18     A   By his bicep and tricep.
15:42:32 19     Q   And they were unable -- and it's your
15:42:33 20 testimony that they were unable, the two men --
15:42:34 21     A   -- to get it out.
15:42:35 22     Q   -- unable to yank it out?
15:42:37 23     A   Correct.
15:42:38 24     Q   Does that sound typical?
15:42:40 25         MR. TALLBERG:  Objection to the form.

Page 76

15:42:43 1          Asked and answered.
15:42:57 2  BY MS. AMANKULOR:
15:42:57 3      Q   Is there anything that you would have done
15:43:00 4  had you been in Officer Allen's or Officer Bosco's
15:43:05 5  position had you been the officer in charge of his
15:43:09 6  left arm?
15:43:10 7          MR. TALLBERG:  Objection to the form.
15:43:14 8  BY MS. AMANKULOR:
15:43:14 9      Q   You can answer.
15:43:16 10         MR. TALLBERG:  If you can, you may
15:43:18 11     answer.
15:43:18 12     A   There's no way for me to tell.  I mean, I
15:43:21 13 wasn't in charge of his left arm.
15:43:23 14 BY MS. AMANKULOR:
15:43:24 15     Q   But have you ever been in that situation
15:43:26 16 where a person that you were trying to arrest has
15:43:29 17 put his arm underneath his body?
15:43:34 18     A   Usually the pain compliance will take care
15:43:39 19 of it.  Not with everybody.
15:43:42 20     Q   And are you aware if Officer Allen or
15:43:45 21 Bosco applied any pain compliance techniques?
15:43:49 22     A   You would have to ask them.
15:43:52 23     Q   Okay.  And once -- getting back to when
15:43:56 24 Argo actually attacked Mr. Bookless and had a hold
15:44:01 25 on him, did any of the officers change position?

Page 77

15:44:07 1      A   What do you mean by "change position"?
15:44:10 2      Q   Did they move in any way?
15:44:13 3          Once Argo attacked Mr. Bookless, did they
15:44:18 4  stay in the same position before Argo attacked?
15:44:22 5          MR. TALLBERG:  Object to the form in
15:44:24 6      particular, the word "attack."
15:44:26 7  BY MS. AMANKULOR:
15:44:26 8      Q   Bit?
15:44:27 9      A   Everybody was constantly moving.  Nobody
15:44:30 10 was staying still.  So, I mean, if you're asking me
15:44:33 11 if Bosco went over to the right arm and moved
15:44:37 12 positions like that, then, no.
15:44:39 13         Everybody stayed pretty much in their
15:44:43 14 location.
15:44:45 15     Q   So do you -- the way that you remember it,
15:44:47 16 did the officers -- were all of the four other
15:44:56 17 officers still in contact with Mr. Bookless when
15:45:00 18 Argo attacked?
15:45:02 19         MR. TALLBERG:  Object to the form.
15:45:02 20 BY MS. AMANKULOR:
15:45:03 21     Q   Did they still have their hands on
15:45:05 22 Mr. Bookless in some way or some body part on
15:45:09 23 Mr. Bookless when Argo bit Mr. Bookless?
15:45:13 24     A   You would have to ask those officers.  I
15:45:16 25 don't recall if all of them were still attached to

Del Vecchio Reporting
(203) 245-9583

a18c70ed-d9c7-4bcf-951e-f0032276963d