## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| JOSEPH J. BOOKLESS, | ) | |
| Plaintiff, | ) ) ) | No. 3:03 CV 123 (WWE) |
| v. | ) ) ) | |
| RANDY IRELAND, JERRY SCULLY, BART DEELEY & RAYMOND WALSH, Defendants. | ) ) ) ) ) | June 16, 2006 |

## PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN EVIDENCE REGARDING INCIDENT AND PRIOR CONVICTIONS

Plaintiff Joseph J. Bookless moves this Court to exclude two categories of evidence proffered by Defendants, police officers employed by the Borough of Naugatuck: 1) certain evidence concerning the crime that Mr. Bookless committed on May 22, 2000, and 2) evidence concerning certain of Mr. Bookless's prior convictions.

### I.    BACKGROUND

On May 22, 2000, Plaintiff robbed Anna Donte's ravioli store, located in Naugatuck, CT. Two women were in the ravioli store at the time of the robbery: Anyslee Lenktaitis and Donna Grillo. Immediately after Plaintiff left Anna Donte's and began running home to 45 Spring Street, Ms. Lenktaitis called 911. As captured on the tape of the 911 radio dispatch that was provided to Plaintiff and transcribed by Defendants, Sgt. Rick Smolicz took the 911 call from Ms. Lenktaitis, who gave a description of Plaintiff, informed Sgt. Smolicz that Plaintiff "had a knife," and stated that the incident "scared the hell out of [her]." (Ex. A (Excerpts of 911 Telephone and Police Radio Dispatch Transcript) at 2-4.)

Defendant Jeremiah Scully, who was in the dispatch center of the Naugatuck Police Department with Sgt. Smolicz at the time of Ms. Lenktaitis's call, did not hear Ms. Lenktaitis over the phone. Instead, he received a description of the crime and of the suspect through Sgt. Smolicz. (*See* Ex. B (Excerpts from Deposition of Jeremiah Scully) at 19:7-20:19; 108:21-109:1 ("Q: [Y]ou did not hear on that day what the victim had said to Sergeant Smolicz? . . . A: No, not that I recall.").) According to the dispatch tape, Sgt. Smolicz sent out a broadcast message to "units responding" giving a description of the robbery suspect and stating that he was "displaying a knife." (Ex. A at 4-5.) Scully also broadcast a message to other officers conveying the description of the suspect and stating that the suspect had a knife; that conversation was captured on the dispatch recording. (Ex. A at 7-8; Ex. B at 108:6-10.) After completing the dispatch, Scully left the building and drove towards the scene of the robbery. While en route, he encountered Plaintiff before having the opportunity to see or speak with Ms. Lenktaitis or Ms. Grillo. (Ex. B at 29:14-32:23.) Scully issued a radio call informing other officers that he was in foot pursuit of Defendant at lower Spring Street. (Ex. A at 10; Ex. B at 116:15-22.)

Defendant Bart Deeley was at home at the time of the incident. He received a call from dispatch asking him to respond to the scene of the robbery. During that call, Deeley was given a description of the suspect and informed that the suspect had "used a knife." (Ex. A at 8-9.) Deeley got into his car and also encountered the site of Plaintiff's arrest before having the opportunity to see or speak with Ms. Lenktaitis or Ms. Grillo. (*See* Ex. C (Excerpts from Deposition of Bart Deeley) at 59:2-22.)

Defendant Randy Ireland learned about the incident by receiving radio dispatches from Sgt. Smolicz and from Scully. He received a "brief description of the person and that he had a knife." (Ex. D (Excerpts from Deposition of Randy Ireland) at 37:20-24.) Ireland also

encountered the site of Plaintiff's arrest before having the opportunity to see or speak with Ms. Lenktaitis or Ms. Grillo, though after receiving an additional brief radio message from Scully regarding his foot pursuit of Plaintiff. (*See id.* at 38:9-40:17.)

Defendant Raymond Walsh did reach Anna Donte's after receiving a dispatch. He recalled having a routine conversation with Ms. Grillo and Ms. Lenktaitis until he heard a subsequent dispatch from Scully that prompted Walsh to go to the scene of Plaintiff's arrest. Walsh did not recall any details of the conversations that took place at Anna Donte's. (*See* Ex. E (Excerpts from Deposition of Raymond Walsh) at 37:19-42:14.)    There is no indication in Defendants' deposition testimony that Walsh ever conveyed any new information that he had learned at Anna Donte's to the other officers at the scene of Plaintiff's arrest.

After Defendants arrived at lower Spring Street, where Plaintiff was located, Plaintiff was arrested, handcuffed, and attacked by a police dog controlled by Deeley. Facts surrounding the arrest, and the injuries sustained by Plaintiff incident to his arrest, are hotly disputed by the parties.

On April 30, 2002, a jury found Mr. Bookless guilty of robbery in the first degree, in violation of General Statutes § 53a-134, and interfering with a police officer, in violation of General Statutes § 53a-167a, for the events that took place on May 22, 2000.

## II.    MOTION TO EXCLUDE CERTAIN EVIDENCE CONCERNING ROBBERY

Defendants' Trial Memoranda indicates that Defendants will seek to call Ms. Grillo and Ms. Lenktaitis as witnesses, and that Defendants may seek to use the entire police dispatch tape as evidence at trial.

Plaintiff objects to calling the victims of Plaintiff's crimes at trial on the grounds that their testimony is not relevant and that its prejudicial effect would strongly outweigh its

probative value. Plaintiff also objects to the use of any portion of the police dispatch tape that was not heard by Defendants at the time of Plaintiff's arrest on the basis of relevance and prejudice.

### A.    Details of the Armed Robbery and Police Chase Unknown to the Three Defendants at the Time of Their Conduct Are Irrelevant.

Only relevant evidence is admissible at trial. Fed. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact . . . more or less probable . . . ." Fed. R. Evid. 401.

Here, the sole focus of this case is whether Defendants acted reasonably under the circumstances when they arrested Plaintiff on May 22, 2000. Consequently, details about the robbery and the description of the suspect *actually given* to the officers over the radio dispatch or in person may be relevant to this lawsuit. But information that was *not known* by Defendants at the time of the incident is completely irrelevant to the suit. *See Graham v. Connor,* 490 U.S. 386, 397 (1989) (asking whether the actions of an officer are "are 'objectively reasonable' *in light of the facts and circumstances confronting them*") (emphasis added); 3 Martin A. Schwartz, *Section 1983 Litigation* § 1.4 (1999) ("[E]vidence of facts pertaining to the plaintiff of which the defendant officers were unaware when force was used is irrelevant in evaluating the reasonableness of their conduct.").

Defendants did not hear any dispatch recording from Ms. Lenktaitis prior to Plaintiff's arrest. Nor did any of them, other than Defendant Walsh, actually speak with or see Ms. Lenktaitis or Ms. Grillo prior to Plaintiff's arrest. Consequently, any portions of the dispatch recording that were not heard by Defendants, including Ms. Lenktaitis's 911 call, and any

testimony from Ms. Lenktaitis or Ms. Grillo concerning the details of Plaintiff's crime, are completely irrelevant to the instant suit.

Moreover, any conversation that Walsh may have had with Ms. Lenktaitis or Ms. Grillo has limited relevance to the instant suit. Walsh does not recall anything out of the ordinary about the conversation he had with these two individuals; rather, he stated that he was simply "interviewing, looking around, seeing, according to the two complainants, what actually took place and what happened, and just normal – normal detective stuff." (Ex. E at 39:14-17.) Walsh independently learned about the incident and the claim that Plaintiff was carrying a knife from the radio dispatches that he and the other Defendants sent or received. (*See id.* at 33:20-33:1; 39:12-41:19.)

**B.     This Testimony Should Be Excluded Based on Rule 403**

Even if this Court concludes believes that testimony regarding specifics of the robbery not provided to the Defendants is relevant to this dispute, this testimony should be excluded because the "probative value is substantially outweighed by the danger of unfair prejudice . . . ." FED. R. EVID. 403.    In addition, prejudice that would result from permitting Ms. Lenktaitis or Ms. Grillo to testify concerning their conversation with Walsh would outweigh any probative value that such testimony might otherwise have.

This is not a case about Plaintiff's conduct before his encounter with Defendants. Plaintiff is being punished severely for his conduct that day, and does not dispute that he committed serious crimes on that day.  Instead, the focus of this trial is on whether the conduct of the four Defendant police officers was reasonable under the circumstances on May 22, 2000. For this reason, the probative value of any information about the robbery and ensuing police chase not known by any of the Defendants at the time of Plaintiff's arrest is nonexistent.  The

probative value of testimony from Ms. Lenktaitis or Ms. Grillo would be low, given the alternative sources of evidence, including portions of the police dispatch recording that *were* sent by or broadcast to Defendants, that are available to Defendants.

If the jury, however, were to hear about the specifics of the robbery from the victims of the robbery, or were to hear a recording of Ms. Lenktaitis's frantic 911 call, which was not heard by Defendants prior to Plaintiff's arrest, the unfair prejudice to Plaintiff would be substantial. Live or recorded testimony about the robbery from traumatized victims of the robbery will distract the jury from proper consideration of whether the Defendant officers acted appropriately on May 22, 2000. This testimony, in short, would put undue focus on Plaintiff's character and prejudice his right to obtain a resolution of this lawsuit based solely on the evidence of his and Defendants' conduct associated with Plaintiff's arrest. *See, e.g., United States v. Wacker*, 72 F.3d 1453, 1472 (10th Cir. 1996) (holding, in a criminal case, that district court should have excluded under Rule 403 "the nature and underlying circumstances" of defendant's crime because this "information tends only to color the jury's perception of the defendant's character, thereby causing unnecessary prejudice to the plaintiff").

### C.    Conclusion

For the reasons stated above, the victims of Plaintiff's robbery should not be permitted to testify at trial. Nor should Defendants be permitted to play any portion of the police dispatch tape that was not heard by Defendants at the time of Plaintiff's arrest. If the Court does choose to permit the victims of Plaintiff's robbery to testify, such testimony should be strictly limited to any statements made to Walsh before Walsh went to the scene of Plaintiff's arrest.

### III.  MOTION TO EXCLUDE EVIDENCE OF CERTAIN PRIOR CONVICTIONS

Defendants have informed Plaintiff that they intend to offer Plaintiff's prior convictions into evidence, including evidence of convictions that are greater than ten years old, pursuant to Fed. R. Evid. 609.    Plaintiff seeks to exclude evidence of his 1998 conviction for assaulting a corrections officer and his 2002 conviction for being a "persistent offender," as well as any convictions that are greater than ten years old.

### A.    Standard of Review

Rule 609 permits introduction of evidence of prior convictions "[f]or the purpose of attacking the credibility of a witness . . . ." Fed. R. Evid. 609(a).  Under Rule 609(a), prior convictions can be admitted in two circumstances.   Under the first prong of Rule 609(a), convictions for crimes punishable by death or imprisonment in excess of one year are admissible to impeach a witness's credibility only if the probative value of admitting this evidence outweighs its prejudicial effect.   Fed. R. Evid. 609(a)(1).   Under the second prong of Rule 609(a), evidence of a conviction involving "dishonesty or false statement" may be admitted regardless of the severity of the punishment. Fed. R. Evid. 609(a)(2).

Even if a conviction would otherwise be admissible under Rule 609(a), Rule 609(b) prohibits the admission of the conviction "if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date" unless stringent conditions are satisfied.   Fed. R. Evid. 609(b).  The party seeking to introduce convictions that are more ten years old must satisfy the Court that "in the interests of justice, . . . the probative value of the [greater than ten-year-old] conviction supported by specific facts and circumstances substantially outweighs its prejudicial

effect." The Second Circuit "ha[s] recognized that Congress intended that convictions over ten years old be admitted 'very rarely and only in exceptional circumstances.'" *Zinman v. Black & Decker (U.S.), Inc.*, 983 F.2d 431, 434 (2d Cir. 1993) (quoting S. Rep. No. 1277, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. (93 Stat.) 7051, 7062).

### B.    Discussion

1.    Evidence of Plaintiff's Convictions for Assaulting a Corrections Officer and for Being a "Persistent Offender" Must Be Excluded

In 1998, Plaintiff pled guilty to assaulting a corrections officer in 1996 pursuant to a plea agreement in which he received a ninety-day sentence for the crime. Admission of this conviction would have minimal probative value in enabling defendants to attack Plaintiff's credibility, and its admission would be highly prejudicial. Plaintiff's conviction for being a "persistent offender" would also have minimal probative value and be highly prejudicial. (See Ex. F (printout of Plaintiff's criminal conviction records (describing conviction for assaulting a corrections officer as "Assault on Police or Fire Officer")).) Consequently, admission of evidence of these convictions must be excluded.

Analysis of the admissibility of the assault and persistent offender convictions is governed by the balancing test of Rule 609(a)(1), as crimes of force are not considered crimes of dishonesty under Rule 609(a)(2). *See United States v. Hayes*, 553 F.2d 824, 827 (2nd Cir.), *cert. denied*, 434 U.S. 867 (1977).

*a.    The Convictions Would Have Little Probative Value*

At trial, plaintiff will not hide from the fact that he was convicted of robbery in the first degree, in violation of General Statutes § 53a-134, and interfering with a police officer, in violation of General Statutes § 53a-167a, for his conduct on May 22, 2000. He is currently

serving an effective 25-year sentence for the crimes he committed on that day. Nor does he seek the exclusion of his 1990 conviction and sentence for robbery, which was not discharged until 1998, despite its minimal probative value.[1]  Thus, there is no risk that the jury will mistakenly believe that Plaintiff has been law-abiding or a "model citizen." *See Lewis v. Velez*, 149 F.R.D. 474, 482-83 (S.D.N.Y. 1993) (noting in Section 1983 case that even if the evidence of all the plaintiff's prior convictions were excluded, the plaintiff "would not profit from a misperception by the jury that he was a model citizen since he will testify about events occurring during his stint as a prison inmate").

Because these convictions may be admitted at trial for the purpose of attacking Plaintiff's credibility, admission of his 1998 conviction for assaulting a police officer and his 2002 "persistent offender" conviction would provide minimal additional impeachment value. *See United States v. Washington*, 746 F.2d 104, 107 (2d Cir.1984) (Newman, J., concurring) ("Once credibility is impeached by a prior felony conviction, the incremental probative force of a second conviction is minimal."); *Lewis*, 149 F.R.D. at 482-83.

     b.    *Admission of the Conviction Would be Highly Prejudicial*

Admission of Plaintiff's conviction for assaulting a corrections officer, and his conviction for being a "persistent offender," would be highly prejudicial.  Admission of the assault conviction could improperly lead the jury to conclude that Plaintiff has the propensity to assault or violently resist a law enforcement officer, even though propensity evidence of this nature should be excluded under Fed. R. Evid. 404.  Admission of the "persistent offender" conviction

---

[1] Plaintiff does, however, seek to limit Defendants' use of the 1990 conviction to the fact and date of the conviction in order to minimize the prejudice that would result if Defendants were able to inquire into details of a conviction for a crime that occurred nearly twenty years ago. *See Daniels v. Loizzo,* 986

could improperly provide a back-door channel by which Plaintiff's convictions that are older than ten years would be admitted.

Since 1971, the Second Circuit has, in the criminal context, prohibited admission of prior convictions for impeachment purposes where the offense is similar to the one for which the defendant is on trial. *See United States v. Puco*, 453 F.2d 539, 542 (2d Cir. 1971) (excluding evidence of prior conviction on grounds that "the potential for prejudice . . . is greatly enhanced where . . . the prior offense is similar to the one for which the defendant is on trial"); *Washington*, 746 F.2d at 107 (Newman, J., concurring) (finding, in criminal case, "no justification and considerable danger in impeaching a defendant's credibility with a prior conviction for the same type of offense as the one on trial when the prosecutor already has available for impeachment another conviction for a different type of offense").

District courts in the Second Circuit have applied this reasoning to Section 1983 cases involving excessive force claims. In *Daniels v. Loizzo*, the court held that the plaintiff's prior convictions for assault and attempted assault on a police officer were not admissible for impeachment purposes because the convictions "closely resembled" the conduct alleged in the plaintiff's excessive force case. 986 F. Supp. 245, 251 (S.D.N.Y. 1997). According to the court, the similarity between the plaintiff's prior assault convictions and the conduct alleged in his civil case might cause a jury to "improperly infer that, based on the prior conviction, the plaintiff instigated the incident." *Id.* The court in *Lewis*, 149 F.R.D. at 482-83 (holding that assault conviction of plaintiff bringing civil rights action against correction offices could not be used to attack the plaintiff's credibility because, "[g]iven the facts of the current case, assault convictions skirt too close to the impermissible suggestion that the plaintiff had a propensity toward violence

---

F. Supp. 245, 251 (S.D.N.Y. 1997) (limiting use of prior conviction to "the fact and date of the

and acted in conformity with his aggressive predisposition"), and *Eng v. Scully*, 146 F.R.D. 74, 78 (S.D.N.Y. 1993) (holding that murder conviction of plaintiff who brought excessive force case should not be admitted for impeachment purposes because its probative value was substantially outweighed by its prejudicial effect), reached similar conclusions.

Evidence of his "persistent offender" conviction pursuant to Conn. Gen. Stat. § 53a-40 would be prejudicial because the jury would not be able to understand the significance of the conviction without reference to prior convictions that would not themselves be admissible. The persistent offender "crime" is one that permits harsher sentencing of defendants who have a significant criminal history. *See id.*    But Fed. R. Evid. 609 generally excludes evidence concerning criminal history if the convictions are greater than ten years old. *See infra.* Permitting the "persistent offender" conviction to be placed before the jury would be unduly suggestive to the jury that Plaintiff possesses a criminal "character," particularly where several other convictions will be admitted by Plaintiff and known to the jury.

On this basis of this reasoning, the Court should exclude evidence of Plaintiff's prior felony conviction for assaulting a corrections officer, as well as his "persistent offender" conviction.

2.    Evidence of Prior Convictions More than Ten Years Old Must be Excluded

Defendants have given Plaintiff the written notice required by Rule 609(b) before convictions greater than ten years old may be admitted at trial. But the written notice did nothing to explain what "exceptional circumstances" would support admission of evidence of convictions greater than ten years old in this case. *Zinman*, 983 F.2d at 434.

---

conviction" to minimize prejudice from admission of the conviction).

In determining whether the requisite "exceptional circumstances" exist, the court must consider a number of factors, including the "the nature, age, and severity of the crime and its relevance to the witness's credibility, the importance of credibility as an issue in the case, the availability of other means to impeach the witness, and whether the witness has 'mended his ways' or engaged in similar conduct recently." *Daniels*, 986 F. Supp. at 252. *Daniels* held that a twelve-year old assault and firearm conviction was not admissible to impeach the plaintiff. *Id.* The court considered the fact that an assault conviction is not generally probative of veracity, that the plaintiff's more recent drug conviction would demonstrate to the jury that the plaintiff had not "mended his ways, and that admitting the older conviction would only have a "piling on" effect. *See id.* When there is sufficient evidence before the jury about other prior convictions, the older conviction adds "marginal additional impeachment value." *Id.*

Plaintiff's convictions that are greater than ten years old should be excluded in this case for similar reasons. Plaintiff has no older convictions that would be probative of his veracity; the convictions extend back for more than twenty years; and the older crimes are similar in nature to the ones that will be admitted by Plaintiff. Consequently, there is no justification for admitting convictions that are more than ten years old in this case.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully asks this Court to grant the motions *in limine* set forth above.

DATED: June 16, 2006

Howard Master (ct26855)
Rachel Amankulor (ct26965)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Tel: 203-498-4400
Fax: 203-782-2889
E-mail: hmaster@wiggin.com

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

On June 16th, 2006, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the foregoing:

| | |
|---|---|
| ___ | Via hand delivery |
| ___ | Via U.S. Mail, 1st Class, Postage Prepaid |
| **X** | Via Overnight Delivery |
| ___ | Via Facsimile |
| ___ | Via E-filing |

I certify under penalty of perjury under the laws of the State of Connecticut that the foregoing is true and correct.

DATED at New Haven, CT, this 16th day of June, 2006.

Howard Master

# Exhibit A



Joseph Bookless V Town of Naugatuck

Case No. 33960-00190

911 Telephone And Police Radio Dispatch Transcript

*TYSZKA COURT REPORTING SERVICES*
*189 Old Forge Road*
*West Hartland, Connecticut 06091*
*pattyszka@cs.com Phone/Fax (860)379-7955*

1               **Joseph Bookless v Town of Naugatuck**

2                     **Case No. 3396000190**

3          **911 Telephone And Police Radio Dispatch Transcript**

4

5                     (911 Telephone Call)

6

7    **SMOLICZ:**  Naugatuck PD, 911.

8    **AYNSLEE:**  There was just a burglary at Annadonte's on

9          North Main Street, 419.

10   **SMOLICZ:**  Uh-huh.

11   **AYNSLEE:**  Oh, my God.

12   **SMOLICZ:**  Just happened now?

13   **AYNSLEE:**  Yeah.  He had a knife and he came at me, and I

14         called for my boss, and he was pushing me, and I

15         called for my boss and she was in the back room.

16   **SMOLICZ:**  Okay.  Did you see which way they went?

17   **AYNSLEE:**  Yeah.  He went left out the door.

18   **SMOLICZ:**  Which way?

19   **AYNSLEE:**  Left out the door on Annadonte --

20   **SMOLICZ:**  Was he on foot?

21   **AYNSLEE:**  Yeah.  He had a knife.

22   **SMOLICZ:**  Annadonte's --

23   **AYNSLEE:**  He had on a blue hoodie.

24   **SMOLICZ:**  Okay.  Give me the description again, please.

25   **AYNSLEE:**  All right.  He had on a blue hoodie, a Giants --

```
 1           New York Giants.  Like bright blue.

 2   SMOLICZ:  A Giants jacket?

 3   AYNSLEE:  No; like a hoodie.  Like a sweatshirt with a

 4           hood on it.

 5   SMOLICZ:  It had "Giants" on it?

 6   AYNSLEE:  Yeah.  He had --

 7   SMOLICZ:  Was he black?  White?

 8   AYNSLEE:  It was blue.  It was blue.

 9   SMOLICZ:  What color was he:  Black or white?

10   AYNSLEE:  Oh, he was white.  Real light skin.  Real light

11           skin.  He had, um, real light eyes.

12   SMOLICZ:  He had a knife?

13   AYNSLEE:  Yeah.

14   SMOLICZ:  Okay.  And what else?

15   AYNSLEE:  Um, he had real light eyes and, um, he just kept

16           on telling us to open up the cash register.  And my

17           boss says like, "Please don't hurt us.  Please

18           don't hurt us."  And she went and she opened it.

19   SMOLICZ:  Okay.  Did you give him any money?

20   AYNSLEE:  Yeah.  He took all the money that was in the

21           cash register.  There wasn't a lot, but --

22   SMOLICZ:  Okay.  We're sending officers there.  I want you

23           to stay on the line with me to make sure he doesn't

24           come back with the knife --

25   AYNSLEE:  Oh, my God.  Oh, my God.  Oh, my God.  Jesus.
```

```
 1          Holy shit.
 2   SMOLICZ:  Okay.  Hold on --
 3   AYNSLEE:  That scared the hell out of me, sir.
 4   SMOLICZ:  Okay.  Just stay on the phone with me, okay?
 5   AYNSLEE:  Okay.
 6
 7                    (Radio Transmission)
 8
 9   SMOLICZ:  Units responding, units responding:  Be advised
10        party's a white male, blue hoodie Giants type
11        sweatshirt, displaying a knife.  I'll get further
12        info.
13
14                (911 Telephone Call Resumption)
15
16   SMOLICZ:  Do you have a height on him?
17   AYNSLEE:  Um, I'd say about 5'10".  I'm guessing because
18        I'm 5'8", and he was a little bit taller than I
19        was.
20   SMOLICZ:  Okay.  About 5'10"?
21   AYNSLEE:  Yeah.
22   SMOLICZ:  Heavy?  Medium?
23   AYNSLEE:  Uh, medium.
24   SMOLICZ:  Medium build?
25   AYNSLEE:  Mm-hmm.
```

```
 1    SMOLICZ:  Okay.

 2    AYNSLEE:  Holy shit.  I'm sorry to keep on swearing.  I'm

 3              just shooken up.

 4

 5                        (Radio Transmission)

 6

 7    SMOLICZ:  Roger.  Further description is a 5'10"

 8              medium-build white male.

 9

10                        (911 Telephone Call Resumption)

11

12    AYNSLEE:  Oh, my God.

13    SMOLICZ:  Okay.  Just stay on the line, okay?

14    AYNSLEE:  Okay.

15              Shit.  He walked by.  I saw him walk by,

16              and then he came back in and he just like -- I

17              didn't know who he was -- are you there?

18    SMOLICZ:  Yup, I'm here.

19    AYNSLEE:  Oh.  I thought he was my boss's friend or

20              something because he just came behind the counter

21              'cause I had the counter down, like, to get in and

22              out 'cause I was washing it, and he just, like,

23              totally, like, freaked, like started pushing me.

24    SMOLICZ:  How many people are inside the store with you?

25    AYNSLEE:  Right now, just me.  My boss, I -- she flew out
```

1          the door.  I don't know where the hell she went,

2          though.

3     SMOLICZ:  Okay.  When the officer gets there, I need you

4          to just -- you're the only one in the store?

5     AYNSLEE:  Yeah.  Is he going to be here soon?

6     SMOLICZ:  Yup.  They'll be there any minute.  They're

7          checking the area real quick, okay?

8     AYNSLEE:  Okay.

9

10                    (Radio Transmission)

11

12    ALLEN:  S-5.

13    DISPATCHER:  S-5.

14    ALLEN:  (Unintelligible) -- the complainant on this.  The

15          party -- (unintelligible) -- the footbridge over

16          toward the Bridge Street area.

17

18                 (911 Telephone Call Resumption)

19

20    AYNSLEE:  Holy shit.

21    SMOLICZ:  Okay.  Hold on.

22    AYNSLEE:  Someone's coming in the store right now.  It's a

23          customer, though.

24    SMOLICZ:  Huh?

25    AYNSLEE:  It's a customer coming in the store.  She's just

1        bringing back something.

2                    Hi, how are you?

3                    Customer:  Okay.

4                    How was your party?

5                    Customer:  Great.

6                    That's good.

7                    Customer:  (unintelligible).

8                    Oh, no.  She left for a minute.  Can I take

9        a message?

10   **SMOLICZ:**  Okay.  The police should be arriving there,

11       okay?

12   **AYNSLEE:**  Okay.

13   **SMOLICZ:**  All right.  Bye-bye.

14   **AYNSLEE:**  All right.  Bye.

15

16                    (Radio Transmission)

17

18   **UNKNOWN MALE MALE:**  Okay.  Need a description there,

19       please.

20   **DISPATCHER:**  44 and 34.

21   **DEOLIVERA:**  44, go.

22   **BERNEGGER:**  34.

23   **UNKNOWN MALE MALE:**  Black?  White?

24   **DISPATCHER:**  Annadonte's, North Main we have a Signal 19

25       that just occurred.  Party is wearing a Giants

```
 1            jacket.  I'll get you any info on weapons or
 2            further description.
 3   BERNEGGER:  34, roger.  North Main, vicinity of where?
 4   DISPATCHER:  There's a left out the store on foot.
 5   DEOLIVERA:  44, roger.
 6   UNKNOWN MALE MALE:  Jerry, I'm in the area.  I'll be
 7            responding as well.
 8   DISPATCHER:  Roger 3.  Be advised a knife was displayed.
 9   UNKNOWN MALE MALE:  Okay.
10   DISPATCHER:  Apparently they got some cash.  Why don't you
11            see if you can secure the scene.  We'll get a K-9.
12   DISPATCHER:  Units responding, units responding:  Be
13            advised party is a white male, blue hoodie Giants
14            type sweatshirt, displaying a knife.  I'll get
15            further info.
16
17                       (Radio Transmission)
18
19   UNKNOWN MALE:  Do you want us to respond over by Pulaski's
20            Walk?
21
22                       (Telephone Conversation)
23
24   DEELEY:  Hello?
25   OBAR:  Bart?
```