1  **DEELEY:**  Yup.

 2  **OBAR:**  We just had a Signal 19 at Annad -- Adamonte's on,

 3      uh -- the ravioli place on North Main Street.

 4  **DEELEY:**  Yeah.

 5  **OBAR:**  The guy used a knife and he fled on foot.  Can you

 6      respond down there?

 7  **DEELEY:**  Yeah.

 8  **OBAR:**  Okay.  I'll tell them you're en route.

 9  **DEELEY:**  Okay.

10  **OBAR:**  Okay?  Bye.

11  **DEELEY:**  Yup.

12

13                  (Radio Transmission)

14

15  **IRELAND:**  27.  We're right on, uh -- by the four corners

16      if you want us to respond over by Pulaski's Walk.

17  **DISPATCHER:**  Roger.  Further description is a 5'10"

18      medium-build white male.

19  **UNKNOWN MALE:**  (unintelligible) -- medium --

20      (unintelligible).

21  **UNKNOWN MALE:**  84.  I'll be 10 in the area, coming off

22      Exit 27.

23  **FEMALE DISPATCHER:**  Roger.  LT-2, 28's en route.

24  **SCULLY:**  Roger.  LT-2 to the first unit that gets there,

25      just secure the scene so we can give it a track.

1    **BERNEGGER:**  34.  What was the actual incident location?

2    **FEMALE DISPATCHER:**  Got to be the rav --

3    **ALLEN:**  S-5.

4    **FEMALE DISPATCHER:**  -- be the ravioli place.  Adamonte's.

5    **ALLEN:**  S-5.

6    **FEMALE DISPATCHER:**  Go S-5.

7    **ALLEN:**  We were just speaking with the complainant on

8            this.  The party ran towards the footbridge over

9            towards Bridge Street area.  We'll be in the area

10           looking.

11   **FEMALE DISPATCHER:**  Roger.  All units just be advised 28's

12           en route.

13   **ALLEN:**  S-5.  Complainant's going back to the scene --

14           (unintelligible) -- meeting her there.

15   **FEMALE DISPATCHER:**  Roger.  First responding unit meet the

16           complainant at the scene.

17   **UNKNOWN MALE:**  30.  10 the area of the walk bridge.

18   **SCULLY:**  LT-2 -- (unintelligible) -- involved in a foot

19           pursuit.  The party's -- (unintelligible) -- get

20           out -- (unintelligible) -- first place he threw a

21           bag.  Wearing a blue jacket.

22   **DISPATCHER:**  Units be advised, I believe they're at lower

23           Spring Street.  Lower Spring Street.

24   **SCHOFIELD:**  48.  I'm en route now.

25   **DISPATCHER:**  Just respond.

1   **DISPATCHER:**  Unit with the suspect, are you on lower

2        Spring?

3    **SCHOFIELD:**  48.  Give me some direction.

4   **DISPATCHER:**  Units with the suspect, you at lower Spring?

5   **DISPATCHER:**  Units, you all on lower Spring or by the

6        walkway?

7    **BERNEGGER:**  34.  Lower Spring, uh, right by --

8        (unintelligible).

9   **DISPATCHER:**  Okay.  You got that under control?

10   **BERNEGGER:**  We have five officers here.

11   **DISPATCHER:**  Units with the suspect?

12   **SCULLY:**  Be advised we have the party.  We have the bag

13        with the jacket and everything in it.

14   **DISPATCHER:**  Okay, LT-2.  Just be advised the complainant

15        stated there was a small amount of cash.  He took

16        everything out of the register.

17   **SCULLY:**  Roger.  Get a car over there and pick up the

18        victim.  If she's the only one there, tell somebody

19        to watch the store while they bring the victim over

20        to positively ID him.

21   **DISPATCHER:**  Roger.  She's the only one there.  Two units

22        that are on with LT-2 advise, break.

23   **DEOLIVERA:**  44.  I'll head down.

24   **DISPATCHER:**  44, who do you have going with you?

25   **PURCARO:**  32.  I can head over there.

Exhibit B

3/30/2006 Scully, Jeremiah J.

1      A.   No.

2      Q.   How about Class No. 71, "New Legal

3  Developments" is the class on September 20, 2001?

4      A.   I believe the "New Legal Updates" is the

5  mandated one where they tell you about the new

6  laws.

7      Q.   So it's about any criminal laws?

8      A.   Right.  Coming into effect for the new

9  year.  Again, without the course syllabus, I can't

10 be sure.

11     Q.   Those are all the questions I had about

12 this document.  Why don't we go ahead and start

13 talking about the events of May 22, 2000.

14     Lieutenant, how did you first learn that a

15 robbery had taken place at Anna Donte's on May 22,

16 2000?

17     A.   I was in the dispatch center of the police

18 department.

19     Q.   Is that where you normally sat?

20     A.   It depends on the day or the task I had.

21     Q.   Were you serving as the dispatcher at the

22 time?

23     A.   Yes, I was.

24     Q.   Were you substituting for someone , or was

25 that one of your normal responsibilities?

---

3/30/2006 Scully, Jeremiah J.

1      A.   Either to cover for dinner if the

2  dispatcher went on dinner or if we couldn't get

3  anybody, we'd have to assign somebody there.  I

4  don't specifically remember the reason why I was

5  there but it had to be covered.

6      Q.   You were in the dispatch center, you said.

7  Did you receive a call about the robbery?

8      A.   Not personally.

9      Q.   Who received the call?

10     A.   Rick Smolicz.

11     Q.   Did you hear the call?

12         MR. TALLBERG:  Object to the form.  You

13     can answer to the extent you're able to.

14         MR. MASTER:  Can I just understand the

15     nature?

16         MR. TALLBERG:  You mean did he hear the

17     phone ring; did he hear the conversation?  If

18     you could be more specific.

19         MR. MASTER:  Sure.

20 BY MR. MASTER:

21     Q.   Did you hear the phone ring?

22     A.   Yes.

23     Q.   What happened next?

24     A.   Sergeant Smolicz answered it.

25     Q.   Did you hear the speaker on the other side

---

3/30/2006 Scully, Jeremiah J.

1  of the line?

2      A.   No.

3      Q.   Did you hear what Sergeant Smolicz said?

4      A.   Yes.

5      Q.   Do you remember what he said?

6      A.   He was having a conversation with the

7  caller, and he was relaying the information as he

8  was getting it.

9      Q.   Meaning he was relaying the information to

10 you?

11     A.   Yeah.  The dispatch center is -- there's a

12 seat here and there's a seat here basically split

13 in half.  It's identical.

14     Q.   Meaning -- for the record, the witness was

15 pointing to two places right next to each other on

16 the table.

17     When you say they're identical, meaning

18 they're -- are the seats very close together?

19     A.   Yeah.  Within four or five feet.

20     Q.   When you say "identical," do you mean

21 identical setups?

22     A.   Yes.  So you can have two people

23 dispatching at once.

24     Q.   What are the setups of the dispatch?

25     A.   Phones, radios, computers for logging

---

3/30/2006 Scully, Jeremiah J.

1  calls.  There's monitors.

2      Q.   What are the monitors?

3      A.   Cell blocks.

4      Q.   So the dispatchers are also responsible for

5  monitoring the cell blocks?

6      A.   Yes.

7      Q.   So getting back to what happened when

8  Officer Smolicz received the call, you heard him

9  speaking to someone on the other side of the line?

10     A.   Uh-huh.

11     Q.   Did he also speak with you while he was on

12 the phone?

13     A.   Yes.

14     Q.   What did he say to you?

15     A.   He gave me the information, descriptions

16 and which way they went, things like that.

17     Q.   What did you do with that information?

18     A.   Dispatched the officers.

19     Q.   Did Officer Smolicz also dispatch the

20 officers directly?

21     A.   He pretty much took the information.  I

22 gave the initial dispatch.

23     Q.   Was that the standard practice of the

24 department when you had two dispatchers?

25     A.   It depends on the situation.

3/30/2006 Scully, Jeremiah J.

**Page 20**

```
 1       Q.  When you say "depends on the situation," do
 2  you mean it depends on how the circumstance -- I
 3  mean, in other words, what were the occasions where
 4  you would do something different?
 5       A.  The nature of the call.  If the nature of
 6  the call was something simple where you could get
 7  the information, say okay, hold on and now give it
 8  out, okay, fine.  But this is one as he was getting
 9  it, we were starting the people.  Time is of the
10  essence.  The person is fleeing.
11       Q.  So it's because of the urgency of the
12  situation that he was relaying the information to
13  you so that you would dispatch while he was still
14  on the call?
15       A.  Well, I think it was the urgency and the
16  fact that there was two of us there which there --
17  you don't always get two dispatchers in there.  As
18  it happened, he was there and I was there and I was
19  able to perform that function.
20       Q.  How do you actually dispatch at that
21  moment?
22       A.  Push the button and send the officers.
23       Q.  When you push the button, does that send --
24  when you push that button, were you able to
25  communicate with all officers in the department?
```

3/30/2006 Scully, Jeremiah J.

**Page 21**

```
 1       A.  Yes.  They all hear it.
 2       Q.  What did you say on that dispatch?
 3       A.  I gave them the information that Smolicz
 4  had given me.
 5       Q.  And that information was?
 6       A.  Description and direction of travel.
 7       Q.  Did you dispatch anyone specifically?
 8       A.  I did.
 9       Q.  Who was that that you dispatched?
10       A.  Officers Bernegger and Crosswait.
11       Q.  I'm sorry to do this, Lieutenant.  I
12  couldn't help notice that you are looking at a
13  document that is in front of you.
14            What is that document that's in front of
15  you?
16       A.  It's a copy of the police report completed
17  by myself.
18       Q.  And are you using that document to refresh
19  your recollection about the events of that day, or
20  is what you're telling me from your recollection
21  absent of that document?
22            MR. TALLBERG:  Object to the form of
23       the question.  You can answer.
24            THE WITNESS:  It's there in case I need
25       to refresh my memory, but I don't believe
```

3/30/2006 Scully, Jeremiah J.

**Page 22**

```
 1       you've asked me any questions that I've had
 2       to use the document for yet.
 3  BY MR. MASTER:
 4       Q.  In the future can you just let me know if
 5  you're using that document to refresh your
 6  recollection about anything that you're telling me
 7  about your recollections about that incident?
 8       A.  Do I have to?
 9       Q.  Well, otherwise -- I mean, I was planning
10  on showing you the document later just to see if it
11  helped refresh your recollection about the
12  incident.  I'm trying to understand what you
13  independently remember about the incident because
14  you might have a memory that -- you might not
15  remember something and the only source of your
16  memory is from the document so --
17       A.  Well, if you tell me I must, I will.  If
18  you tell me I don't, I won't.
19       Q.  Well, an alternative would be we can just
20  have the conversation and you can look at the
21  document later.
22       A.  Are you telling me that's what I must do?
23  I guess my question is:  Am I entitled to have it?
24            MR. TALLBERG:  I think the witness, if
25       he needs to refresh his recollection, he can
```

3/30/2006 Scully, Jeremiah J.

**Page 23**

```
 1       and we'll try to keep it clear for the
 2       record.
 3            MR. MASTER:  That's all.  I just want
 4       it to be clear for the record.
 5            THE WITNESS:  Sure.
 6  BY MR. MASTER:
 7       Q.  So what happened after you dispatched
 8  Officers Bernegger and Crosswait?
 9       A.  I then left Sergeant Smolicz on the desk
10  and began to head to the scene.
11       Q.  Did you hear anything else?
12       A.  Yes.
13            MR. TALLBERG:  Object to the form.
14  BY MR. MASTER:
15       Q.  At that moment after you dispatched
16  Officers Bernegger and Crosswait, did you hear
17  anything else over the radio?
18       A.  Yeah.  There was a flow of information from
19  Sergeant Smolicz to the cars responding.  There was
20  the cars letting dispatch know where they were and
21  where they were going, so yes.  I also at some
22  point got on the radio myself.
23       Q.  Could you describe to the best of your
24  recollection what was coming in over the radio --
25            MR. TALLBERG:  Object to the form.
```

3/30/2006 Scully, Jeremiah J.

1   BY MR. MASTER:
2        Q.   -- before you left the dispatch center?
3        A.   I dispatched the cars.  The cars were in
4   route and where they were coming from and where
5   they were going.  There were some other cars that
6   radioed that they were in the area, and one was
7   going to go over and look by the foot bridge.  The
8   other -- they all gave different locations and
9   different things that they were going to do.
10       Q.   Could you be more specific if you remember
11  more specifically which cars, which people radioed
12  in?
13       A.   Well, Bernegger and Crosswait was
14  dispatched.  Bosco was going to the area, and
15  that's all I can recall at the moment.
16       Q.   At any point in time did you ever speak
17  with the victims of the robbery?
18            MR. TALLBERG:  Object to the form.
19  BY MR. MASTER:
20       Q.   While you were still at the dispatch
21  center?
22       A.   No.
23       Q.   So the whole time it was Officer Smolicz
24  who was on the phone with them?
25       A.   Yes.

3/30/2006 Scully, Jeremiah J.

1   record?
2        A.   It's a Borough of Naugatuck Engineering
3   Department aerial photo of Spring Street and Bridge
4   Street, Naugatuck, Connecticut, scale of 1 inch
5   equals 100 feet.
6        Q.   Can you point out on the map where you were
7   when you -- when the police department received the
8   call about the robbery at Anna Donte's?
9        A.   I can point to the police department
10  itself.
11       Q.   That's fine.
12            And that is at the top northeast corner of
13  the map?
14            MR. TALLBERG:  Northwest.
15            MR. MASTER:  Northwest.  I'm sorry.
16            THE WITNESS:  Where is the arrow?
17            MR. TALLBERG:  I don't think there are
18       rows on this one but --
19            THE WITNESS:  This is North Spring
20       Street so that's going north.  Does that
21       answer it for you?
22  BY MR. MASTER:
23       Q.   Yes.  I was just trying to get it into the
24  record.
25            So what did you do when you got in your car

3/30/2006 Scully, Jeremiah J.

1        Q.   What did you do next?
2        A.   After what?
3        Q.   After you said you left the dispatch center
4   to go to the scene.
5        A.   I went up and got in my cruiser.
6        Q.   Was anyone else in the cruiser with you?
7        A.   No.
8        Q.   Do you have your own cruiser, or did you at
9   that time have a cruiser that was for your use?
10       A.   For that shift?
11       Q.   Yes.
12       A.   Yes.
13       Q.   What did you do next?
14       A.   Got in it.
15       Q.   Turned on the motor?
16       A.   Yes, and began to head to the scene.
17       Q.   Let me take out a document that's
18  previously been marked Exhibit 4.
19            Do you recognize this document, Lieutenant?
20            MR. TALLBERG:  For the record, this is
21       a map of the portion of the Borough of
22       Naugatuck.
23            THE WITNESS:  Yes.
24  BY MR. MASTER:
25       Q.   Can you just explain what it is for the

3/30/2006 Scully, Jeremiah J.

1   and left the police department headquarters?
2        A.   Drove towards the scene.
3        Q.   How is that?  That was you made a left on
4   Spring Street?
5        A.   I made a left out of the police department
6   onto Spring Street.
7        Q.   Did you have your sirens on?
8        A.   No.
9        Q.   Were you driving quickly?
10       A.   Normally.
11       Q.   What were you intending to do when you got
12  down to the scene?
13       A.   Go down and take command of the scene.
14       Q.   When you say "take command of the scene,"
15  what were you planning on doing at the scene?
16       A.   Just direct the personnel to do different
17  things, make sure it was secured.  We had called
18  for a canine to come and try to complete a track
19  because he had fled on foot, make sure any evidence
20  that was there was secured.  It depends on what the
21  scene presented.
22       Q.   I just want to get some more clarification
23  and more information about what you just said.  You
24  said you had called for a canine to complete a
25  track.

3/30/2006 Scully, Jeremiah J.

```
1          Was it you who actually called the canine
2    unit?
3        A.    Picked the phone up and did it?
4        Q.    Yeah.
5        A.    No.
6        Q.    How did it come to be that the canine unit
7    was called?
8        A.    I radioed headquarters and had them make
9    the call.
10       Q.    Did you radio them from your car?
11       A.    Yes.
12       Q.    It occurred to you after you left the
13   headquarters that a canine unit might be useful?
14       A.    Yes.
15       Q.    Why was that?
16       A.    The suspect was reported to have fled on
17   foot, and we were hoping to track the suspect from
18   the scene to wherever he went.
19       Q.    When did you learn that the suspect had
20   fled on foot?
21       A.    That was learned through Sergeant Smolicz.
22       Q.    How did you learn that a canine unit had in
23   fact been called?
24       A.    Dispatch advised me.
25       Q.    Did you hear the conversation with the
```

3/30/2006 Scully, Jeremiah J.

```
1    canine unit between the dispatcher and the canine
2    unit?
3        A.    On the phone?
4        Q.    Yes.
5        A.    No.
6        Q.    Was there a separate dispatcher who made
7    those calls other than you and Sergeant Smolicz?
8        A.    I don't know.  I wasn't in dispatch.
9        Q.    When you left dispatch, did someone else
10   come to replace you in dispatch?
11       A.    I don't recall.  Did I specifically bring
12   somebody in, no.  Did somebody go in there and
13   assist the sergeant, I don't recall.
14       Q.    Now, you had said that you were heading to
15   Anna Donte's to take command of the scene.
16             Were you the commanding officer on duty at
17   that time?
18       A.    Yes.
19       Q.    Did that mean that you were the highest
20   ranked officer who was on duty at the department at
21   that moment?
22       A.    I don't know
23       Q.    Can you explain what it means to be the
24   commanding officer?
25       A.    Basically, this was a patrol function until
```

3/30/2006 Scully, Jeremiah J.

```
1    the DB took it over; so it would have been my
2    responsibility to secure the scene and bring in the
3    necessary resources.
4        Q.    When you say "DB," what is that?
5        A.    Detective bureau.
6        Q.    So I just want to understand better how
7    that policing function worked.
8              You were the commanding officer responsible
9    for the patrol function?
10       A.    Uh-huh.
11       Q.    And the detectives, were you also
12   responsible for the detectives?
13       A.    No.
14       Q.    Who was responsible for the detectives on
15   that shift?
16       A.    That would have been Sergeant Allen.
17       Q.    Was there a reason why you didn't have your
18   sirens on and weren't driving quickly down Spring
19   Street?  You had said earlier that it was an urgent
20   situation.  Was it because there were other
21   officers already on the scene?
22             MR. TALLBERG:  Object to the form, but
23        you can answer.
24             THE WITNESS:  No.
25   BY MR. MASTER:
```

3/30/2006 Scully, Jeremiah J.

```
1        Q.    Why did you not have your sirens on?
2        A.    My responsibility was to go over.  There
3    were people radioed that they were on scene.
4    Officers were in the area looking for the suspect.
5    The risk of going lights and siren over there for
6    me when my function is just to make sure everybody
7    is doing what they're supposed to be doing, the
8    risk of going lights and siren didn't outweigh the
9    need for me to get there immediately.
10       Q.    By "risks," you mean the risk that someone
11   would get injured as a result of the lights and
12   siren?
13       A.    Yeah.  Going through intersection lights
14   and siren, I just didn't feel it was necessary.
15       Q.    What happened next as you were driving down
16   Spring Street?
17       A.    I came down and stopped in a line of cars
18   at Spring Street's intersection with Bridge.
19       Q.    And what did you see when you stopped at
20   that intersection?
21       A.    Cars stopped in front of me.
22       Q.    What did you do next?  Did you continue on
23   to Bridge Street?
24       A.    No.
25       Q.    Why was that?
```

```
1           A.   I saw a white male fitting the description
2      of the robbery suspect walking north on Spring
3      Street.
4           Q.   Where was he on Spring Street?
5           A.   He was just south of Leary's Package Store.
6           Q.   Is that right near the corner of Bridge
7      Street?
8           A.   It's probably within 100/200 feet.
9           Q.   What led you to conclude that he fit the
10     description of the suspect?
11          A.   He was a white male.  He was about the same
12     height, 5-10.  He was breathing heavy.  He was red.
13     He was sweating profusely, and I could see that he
14     had a transparent bag in his hand with a piece of
15     blue clothing.
16          Q.   What did you do when you saw him?
17          A.   I pulled into the oncoming lane and began
18     to park parallel to the curb.
19          Q.   And that was because he was right there at
20     the sidewalk?
21          A.   Yeah.  He would have been on the east side
22     sidewalk, I guess you'd want to call it.  On the
23     side of Leary's Package Store, if that helps you.
24          Q.   Had you seen that individual before?
25          A.   Not that I know of, no.
```

3/30/2006 Scully, Jeremiah J.

1        I wanted to ask if you could help us
2    interpret a tape that your counsel had provided to
3    us, because there are a number of codes in the tape
4    that I'm not understanding and also --
5            MR. TALLBERG:  Could we go off the
6        record for just one second.
7            (Off the record.)
8    BY MR. MASTER:
9        Q.  I'd like to show the witness a copy of a
10   one-page document listed "History report."  It is
11   two pages.  There are two separate pages to this
12   exhibit.
13           MR. TALLBERG:  They may be two separate
14       documents.
15           MR. MASTER:  Okay.  Let's put them as
16       two different exhibits then.  They're two
17       different incident reports.
18           MR. TALLBERG:  History reports.
19           MR. MASTER:  Two different documents.
20       They're both history reports.  One says at
21       the top right "Incident 00-12137."  The other
22       is labeled "Incident 00-12143."
23   BY MR. MASTER:
24       Q.  Do you recognize these documents?
25       A.  Yes.

1        Q.  Have you seen them before?
2        A.  Yes.
3            MR. MASTER:  I'd like to introduce them
4        as Exhibit Nos. 22 and 23.  Incident 00-12137
5        will be Exhibit 22 and Incident 00-12143 will
6        be Exhibit 23.
7            (Plaintiff's Exhibit Nos. 22 and 23:
8        Marked for identification.)
9    BY MR. MASTER:
10       Q.  Lieutenant, I would just like to get some
11   clarification from you about what these documents
12   mean.
13           Looking at Exhibit No. 22, the document
14   says on the top left "120 robbery."
15           What does the number 120 mean?
16       A.  It's just a code for robbery.
17       Q.  At the bottom of that box there's a table
18   that has column headings "ASNMT, officer, DISP,
19   ARRV and CLRD."
20       A.  Yes.  Okay.
21       Q.  Could you explain to me what these codes
22   are underneath the column "ASNMT."
23       A.  I think that stands for assignment.
24       Q.  For example, it says under "assignment,"
25   the first entry under assignment is "P," what looks

3/30/2006 Scully, Jeremiah J.

1    like a lower case "L" and then "27."
2            What does that represent?
3        A.  "PL" is the abbreviation for patrolman, and
4    "27" is his badge number -- not his badge number.
5    It's his ID number.
6        Q.  And the same would be true for all of the
7    other entries under that column, those would be ID
8    numbers for the officers who are listed in the next
9    column?
10       A.  All the "PL"s would be patrolmen.
11       Q.  And I see on one of the rows of that table
12   it says "LT2."
13       A.  Uh-huh.
14       Q.  And next to it is your name.
15           Was that your -- was "LT2" your code at the
16   time of the incident?
17       A.  It was.
18       Q.  I'm sorry.  Is it ID or code?
19       A.  Most of us call it badge number, but it's
20   not your physical badge number.  We don't have
21   numbers on our badge.  It's the ID number you use
22   for your computer entries and all that.
23       Q.  I just want to ask about the box on the
24   right that says "Incident disposition."
25       A.  Uh-huh.

1        Q.  It says "Action," and then in the
2    box "All."
3            What does that mean?
4        A.  I think action 11 is criminal arrest.
5        Q.  So it just explains that an arrest resulted
6    from the complaint?
7        A.  Correct.
8        Q.  Now I want to ask you about Exhibit 23, and
9    it's Code 15.  Is that the -- or it says "15" at
10   the top left-hand side of the document.
11           What does "15" represent?
12       A.  That's an ambulance call.
13       Q.  Can you explain why this document was
14   created?
15       A.  To document an ambulance call.
16       Q.  Does it explain who called the ambulance?
17       A.  It explains who requested it.
18       Q.  And does it explain who went onto the
19   ambulance?
20           MR. TALLBERG:  Object to the form.  You
21       can answer if you understand.
22           THE WITNESS:  Well, I can tell you that
23       Joseph Bookless went.
24   BY MR. MASTER:
25       Q.  Okay.

3/30/2006 Scully, Jeremiah J.

1    A.  And it would appear -- it appears that
2  Ireland and Schofield went.
3    Q.  Why do you say that?
4    A.  Because the ambulance, Ireland and
5  Schofield are dispatched at the same time.  They
6  arrive at the same time.  Then you can see that
7  Ireland and Schofield have cleared at the same
8  time.
9    Q.  If you could just refer to these history
10 reports to refresh your recollection about the IDs
11 of the officers.
12   A.  Just so you know, there is one on there
13 that you can't read on both of them.  I'm not sure
14 who that is.
15   Q.  I see.  Okay.
16      So what I'm going to do is I'm going to
17 play a section of this tape.  I'm just going to ask
18 you first if you have ever heard this -- recall
19 ever hearing this section of the tape before and
20 then to the extent that it's not clear from the
21 tape, I'm just wondering if we can get your
22 assistance in interpreting the tape.  All right?
23   A.  Okay.
24      MR. MASTER:  First for formalities, I'd
25      like to introduce this tape as exhibit --

3/30/2006 Scully, Jeremiah J.

1  Plaintiff's Exhibit 24.  This is an
2  audiocassette tape provided to us by counsel
3  for the defendant.
4      (Plaintiff's Exhibit No. 24:  Marked
5  for identification.)
6      (Tape playing.)
7      MR. TALLBERG:  If I may just state my
8  objection for the record to this audio
9  machine.  It seems to have a speed control.
10     MR. MASTER:  Yes.
11     MR. TALLBERG:  And as you change that,
12 it changes the sound of the voice such that
13 it's indistinguishable from voices that I
14 might otherwise recognize.  I expect the
15 Lieutenant might have the same problem.
16     Having stated that objection, please
17 proceed.
18     MR. MASTER:  Unfortunately, it
19 doesn't -- also for the record, the tape
20 player doesn't say what the standard speed
21 is.
22 BY MR. MASTER:
23   Q.  Lieutenant, have you heard that
24 conversation before?
25   A.  I have.

3/30/2006 Scully, Jeremiah J.

1    Q.  When did you hear it?
2    A.  About a week ago.
3    Q.  Did you hear it at the time that that
4  recording was made?
5      MR. TALLBERG:  I'll object to the form
6      of the question.  We just heard a big
7      snippet.  If we could break it down somehow
8      it might work better.
9      Having stated that, you can answer.
10 BY MR. MASTER:
11   Q.  Had you heard any of that before?
12   A.  About a week ago.
13   Q.  I'm sorry.  Before a week ago?
14     THE WITNESS:  Did we ever listen to it
15     prior to that?
16     MR. TALLBERG:  I'll assert the
17     attorney-client privilege and state that
18     yeah, in our communications we've listened to
19     the tape.
20 BY MR. MASTER:
21   Q.  Do you know whose voices were on that
22 recording, understanding that there are some speed
23 issues?
24   A.  For the small piece that we listened to, it
25 was Rick Smolicz and Donna -- no.  What was Aynslee

3/30/2006 Scully, Jeremiah J.

1  Lenktaitis's name?  Am I saying her name right?
2      MR. TALLBERG:  Aynslee.
3      THE WITNESS:  Okay.
4      MR. MASTER:  We'll play the next
5      section.
6      (Tape playing.)
7  BY MR. MASTER:
8    Q.  Whose voice was on the recording there?
9  Someone said "Units responding.  Units responding."
10   A.  Play it back.
11     (Tape playing.)
12     MR. TALLBERG:  Can we just try that
13     again with a different speed because as you
14     change that speed, it changes the whole tone
15     of the voice.  Off the record.
16     (Off the record.)
17     (Tape playing.)
18 BY MR. MASTER:
19   Q.  Lieutenant, I just wanted to understand, is
20 your voice on that tape?
21     MR. TALLBERG:  Object to the form.  You
22     mean so far as he heard his voice?
23 BY MR. MASTER:
24   Q.  So far have you heard your voice?
25   A.  No.

3/30/2006 Scully, Jeremiah J.

1    Q.   So the individual who said "Units
2    responding.  Units responding," was that Sergeant
3    Smolicz?
4    A.   Yes.
5    Q.   I'm going to play some more.
6         (Tape playing.)
7    BY MR. MASTER:
8    Q.   Lieutenant Scully, have you heard your
9    voice yet on that tape?
10   A.   No.
11        (Tape playing.)
12   BY MR. MASTER:
13   Q.   Did we hear your voice at all during that
14   tape?
15   A.   No.
16   Q.   Had you heard any part of that tape before
17   your meetings with your attorney?
18   A.   I don't recall.  Possibly.
19   Q.   When might you have heard that?
20   A.   When it was requested.
21   Q.   But not at that moment?  You never -- you
22   did not hear on that day what the victim had said
23   to Sergeant Smolicz?
24        MR. TALLBERG:  Object to the form of
25        the question.  You can answer.

3/30/2006 Scully, Jeremiah J.

1    BY MR. MASTER:
2    Q.   Was that the same voice -- he said it
3    was --
4         (Tape playing.)
5    BY MR. MASTER:
6    Q.   Is that your voice:  "Roger that.  Be
7    advised a knife was displayed"?
8    A.   Yes.
9         (Tape playing.)
10   BY MR. MASTER:
11   Q.   Is that you who just gave that description?
12   A.   Play it again.
13        (Tape playing.)
14        THE WITNESS:  Let me know when you want
15        it to stop.
16        MR. MASTER:  Yes.  And this is the
17        portion.
18        (Tape playing.)
19        THE WITNESS:  No.
20   BY MR. MASTER:
21   Q.   Do you know who that was?
22   A.   That's that same initial call you hear is
23   you're hearing it now again with Sergeant Smolicz.
24   So if you go back to your first call where you hear
25   all that "Units responding," it's the same --

3/30/2006 Scully, Jeremiah J.

1         THE WITNESS:  No, not that I recall.
2         MR. MASTER:  I'm going to play some
3         more tape.
4         (Tape playing.)
5    BY MR. MASTER:
6    Q.   Is that your voice?
7    A.   That is, yes.
8    Q.   When you say "44 and 34," were you
9    referring to officers?
10   A.   Yes.
11   Q.   Which officers were those?
12   A.   Deoliveria and Bernegger.
13   Q.   Thank you.
14        (Tape playing.)
15   BY MR. MASTER:
16   Q.   You refer to "19 has just occurred."
17        What is 19?
18   A.   That's a robbery.
19        (Tape playing.)
20   BY MR. MASTER:
21   Q.   Do you know what that portion of the tape
22   was just said?  I can play it again for you.
23   A.   Yeah.  I'm not actually sure who that voice
24   is.
25        (Tape playing.)

3/30/2006 Scully, Jeremiah J.

1    you're just picking it up the same way.
2    Q.   It's the same --
3    A.   What happens is that Dictaphone -- and you
4    have to get Lieutenant Bozenski.  But basically,
5    the Dictaphone records individual lines.  So when
6    you do the playback, you could be talking on the
7    phone and somebody talking on the radio, you'll get
8    the phone and the radio because the receiver is
9    picked up.  So sometimes you'll hear the same
10   thing.
11        MR. TALLBERG:  At 1:15 I'm supposed to
12        have a brief call, and it might be a good
13        time to break rather than have my phone
14        ringing.
15        MR. MASTER:  That's completely fine.
16        Do you want to take --
17        MR. TALLBERG:  A ten-minute break,
18        something like that.  You don't think you
19        need a lunch break?  I have the sense you
20        don't have a whole lot more.
21        MR. MASTER:  No.  We don't have a whole
22        lot more.  Can we just make it maybe fifteen?
23        MR. TALLBERG:  Sure.
24        (Whereupon a recess was taken.)
25   BY MR. MASTER:

**Page 112**

1  Q.  We're back on the record, and I just have a
2  couple more sections to go through of this tape and
3  then just a few other questions and then we'll be
4  done.
5          (Tape playing.)
6  BY MR. MASTER:
7  Q.  Just for the record, there's a brief
8  section of tape that began with "Hello" and
9  response "Bart.  Yup."
10         Do you know who was speaking on that
11 section of tape?
12 A.  You'd actually have to play it back and try
13 adjusting the voice a little bit.
14 Q.  Okay.
15         (Tape playing.)
16         THE WITNESS:  The person making the
17         call is Caroline Obar.
18 BY MR. MASTER:
19 Q.  Caroline Obar, O-b-a-r?
20 A.  Yes.
21 Q.  Who's on the other line?
22 A.  Bart Deeley.
23 Q.  I just want to confirm that.  I'll play the
24 next section.
25         Actually, before I do that, who is Caroline

**Page 113**

1  Obar?
2  A.  She was a patrolman at the time.
3  Q.  Is she still with the police department?
4  A.  No.
5  Q.  Do you know where she went?
6  A.  Yes.
7  Q.  Where did she go?
8  A.  Beacon Falls Police Department.
9  Q.  After hearing that section of tape, do you
10 remember asking Caroline Obar to call Bart Deeley?
11 A.  Yes.  Well, call for canine.  I don't know
12 if I specifically asked for Bart.
13         (Tape playing.)
14         THE WITNESS:  I know who that is from
15         the number.  That doesn't sound right.  You
16         have to adjust it a little bit.
17         MS. AMANKULOR:  Do you think it should
18         be faster or slower?
19         THE WITNESS:  Probably a little bit
20         slower.  Might as well take care of it now.
21         (Tape playing.)
22 BY MR. MASTER:
23 Q.  Just for the record, it began with -- this
24 is a section of tape that begins with the words
25 "27.  We are right on -- by the four corners."

**Page 114**

1          Do you know who is speaking in that section
2  or who said that?
3  A.  Yes.
4  Q.  Who is that?
5  A.  Randy Ireland.
6  Q.  And you know that because he was No. 27?
7  A.  Twenty-seven, and I'm able from this tape
8  to recognize his voice.
9  Q.  Do you know who was responding to Randy
10 Ireland?
11 A.  Play it back.  I did.  I just forgot what
12 was said.  Just the brief part.
13         (Tape playing.)
14         THE WITNESS:  That's Rick Smolicz.
15         (Tape playing.)
16 BY MR. MASTER:
17 Q.  Do you know what that was saying?
18 A.  Do you know what they said?
19 Q.  Yeah.  It says -- we have it transcribed
20 as "Roger.  Twenty-eight is on route," or "Roger.
21 LT2 28 is on route."
22         (Tape playing.)
23 BY MR. MASTER:
24 Q.  Was that your voice on tape to secure
25 the -- when you arrive on scene -- let me play it

**Page 115**

1  again.
2          (Tape playing.)
3  BY MR. MASTER:
4  Q.  Do you know who that is, who's speaking?
5  A.  Yes.
6  Q.  Who is that?
7  A.  Myself.
8  Q.  Who were you speaking to when you were
9  asking people to secure the scene?
10 A.  Whoever's the first one on scene.
11 Q.  I see.  Okay.
12         (Tape playing.)
13 BY MR. MASTER:
14 Q.  What is -- someone is asking "That's 5" and
15 another person is answering "That's 5."  What does
16 that mean?
17 A.  They're not saying "that's 5."  They're
18 saying "S5" which is the -- that's the ID number
19 for then Sergeant Allen who is now Lieutenant
20 Allen.  "S" is the abbreviation for sergeant.
21 Q.  Why would they be communicating about that?
22 Does that mean that Sergeant Allen was calling in
23 to the dispatcher?
24 A.  Yes.
25         (Tape playing.)

**Page 116**

```
1    BY MR. MASTER:
2       Q.   On the tape it says, "We were just speaking
3    with the complainant on this."
4            Is that the voice of Sergeant Allen?
5       A.   Yes.
6            (Tape playing.)
7    BY MR. MASTER:
8       Q.   The dispatcher, for the record, just
9    said, "All units be advised 28 is on route."
10           Who is 28?
11      A.   It's actually still Patrolman Obar who's
12   working the dispatch desk at that point, but she is
13   sending -- she's telling us that Deeley is in
14   route.
15      Q.   Thanks.
16           (Tape playing.)
17   BY MR. MASTER:
18      Q.   Is that your voice?
19      A.   It is.
20      Q.   I'd like your help getting the best
21   transcription I could of what you're saying right
22   there.
23      A.   Do you have something close written down,
24   or do you want me to try to write it all down?
25      Q.   Let me give you another piece of paper.
```

**Page 117**

```
1            (Tape playing.)
2    BY MR. MASTER:
3       Q.   Do you want me to play it one more time?
4       A.   Hang on a second.
5            Yes.  Play it again.
6            (Tape playing.)
7            THE WITNESS:  Play it again.
8            (Tape playing.)
9            MR. MASTER:  One more time.
10           (Tape playing.)
11   BY MR. MASTER:
12      Q.   Are you --
13      A.   I can get it close.
14      Q.   As best you can.
15      A.   Obviously, it's not the best tape.  It
16   sounds like "LT2.  I was just involved a foot
17   pursuit.  I have a party at gun point.  Get down."
18   Then I believe it says "Down on Spring Street he
19   threw a bag with a blue jacket in it."  Obviously
20   with the breathing heavy and everything it's a
21   little difficult to interpret, but that's the best
22   recollection I can give you from it.
23      Q.   Lieutenant, is that a recording of the call
24   that you made from your radio that you described
25   earlier?
```

**Page 118**

```
1       A.   Yes.
2       Q.   To your knowledge are all calls from your
3    radio recorded by --
4            MR. TALLBERG:  Object to the form.
5    BY MR. MASTER:
6       Q.   To your knowledge does the system, the
7    radio system, record all calls from your radio?
8            MR. TALLBERG:  Objection.  You mean on
9        May 22, 2000?
10           MR. MASTER:  Yes, on May 22, 2000.
11           THE WITNESS:  Yeah.  All calls from my
12       radio were recorded.
13   BY MR. MASTER:
14      Q.   Do you recall making any other calls from
15   your radio notifying individuals that you had
16   had -- that you had a suspect at gun point?
17           MR. TALLBERG:  Could I ask that we just
18       allow that to continue playing a second time
19       so it's on the transcript after that section.
20           MR. MASTER:  Off the record for a
21       moment.
22           (Off the record.)
23   BY MR. MASTER:
24      Q.   Would you like to hear that section of tape
25   again, or you're as comfortable as you can?
```

**Page 119**

```
1       A.   No.  I think I've got it pretty close.
2       Q.   I'm going to play on.
3            (Tape playing.)
4    BY MR. MASTER:
5       Q.   Do you know who is speaking on that?  It
6    says, "Units please be advised."  I'm going to play
7    the tape again just to clarify.
8            (Tape playing.)
9    BY MR. MASTER:
10      Q.   So is there any -- did you want to offer
11   any clarification about what you had said on the
12   radio?
13      A.   Yeah.  Part of that, "I was down on Spring
14   Street."  In between that it should be "I was down
15   on lower Spring."
16      Q.   The next section of tape says "Please be
17   advised."  Do you know who is saying that?  Was it
18   Sergeant Smolicz?
19      A.   "Please be advised."  What was the rest?
20      Q.   It says something that "Lower Spring
21   Street."
22      A.   Sergeant Smolicz, Rick Smolicz.
23      Q.   Do you know what the person said in
24   response?  I can play it again.
25      A.   Play it again, please.
```

1      (Tape playing.)
2      THE WITNESS:  That's Officer Deeley.
3  BY MR. MASTER:
4      Q.   Do you know what he's saying?
5      A.   I believe it was "I'm in route now."
6      Q.   Great.  Thank you.
7      (Tape playing.)
8  BY MR. MASTER:
9      Q.   I just played a section where Sergeant
10  Smolicz, I believe, said, "Unit with the suspect,
11  you are on lower Spring."  And then someone
12  responded.
13     A.   Play it again.  I got "PL28."
14     (Tape playing.)
15     THE WITNESS:  One more time.
16     (Tape playing.)
17     THE WITNESS:  It sounds like "28.  Give
18     me some directions."
19  BY MR. MASTER:
20     Q.   Who's 28?
21     A.   Officer Deeley.
22     Q.   Was that Officer Deeley speaking asking for
23  directions or --
24     A.   It sounds like -- obviously this isn't the
25  best tape, as we already talked about.  It sounds

6/16/2006 1:25 PM                                    120

1  actual -- reflects the actual passage of time
2  between the first -- the earlier radio
3  transmission was made and this transmission that
4  we're now discussing, or could this just have been
5  two excerpts of tape that happened to have been put
6  onto this cassette and spaced out?
7      A.   Could you play it for me again, what you're
8  specifically talking about.
9      Q.   Sure.
10     (Tape playing.)
11  BY MR. MASTER:
12     Q.   From the point after "Just respond" to the
13  next section.  I can time it.
14     (Tape playing.)
15  BY MR. MASTER:
16     Q.   It's about fifteen seconds.
17     A.   It sounds like all one to me.
18     Q.   Okay.  So now could I just get some help
19  interpreting these two garbled statements.
20     A.   Maybe.
21     Q.   If you can, of course.
22     (Tape playing.)
23     THE WITNESS:  That one you got.
24     MR. TALLBERG:  We already did that.
25     THE WITNESS:  "Twenty-eight  give me

6/16/2006 1:25 PM                                    122

1  like Officer Deeley, yes.
2      (Tape playing.)
3  BY MR. MASTER:
4      Q.   Do you want me to play that again?
5      A.   Yes, please.
6      Q.   I'm just going to ask for your best
7  interpretation of what that said.
8      (Tape playing.)
9      THE WITNESS:  From what point to what
10     point do you want me to try to interpret it?
11  BY MR. MASTER:
12     Q.   The dispatcher's voice is clear.  It
13  says "Units on lower Spring or by the walkway," and
14  then there's a response that is difficult to
15  understand.  Then the dispatcher says, "Okay.
16  You've got that under control," and then there's a
17  response.  I'll play it again.
18     MR. TALLBERG:  I just want to note for
19     the record that there was a long pause where
20     there were no words spoken between the two
21     transmissions we've just heard.
22     MR. MASTER:  Yes.  And actually, if I
23     can get some clarification on that.
24  BY MR. MASTER:
25     Q.   Do you know whether that pause reflects an

6/16/2006 1:25 PM                                    121

1      some directions."
2      MR. MASTER:  Yes.
3      (Tape playing.)
4      THE WITNESS:  You got that, right?
5      MR. MASTER:  Yes.
6      (Tape playing.)
7  BY MR. MASTER:
8      Q.   There's another passage of time there,
9  about 20 seconds.
10     Do you know if that's part of the same
11  tape?
12     A.   It sounds like it's all the same tape
13  because you can hear a mike getting keyed.
14     Q.   Okay.
15     (Tape playing.)
16  BY MR. MASTER:
17     Q.   Would that mark the end of a section?
18     A.   It sounds like it to me, yes.
19     Q.   When you say "a mike getting keyed," does
20  that mean it's just an officer touching the button
21  that activates the mike?
22     A.   Correct.
23     (Tape playing.)
24     THE WITNESS:  You got that?
25     MR. MASTER:  Yes.

6/16/2006 1:25 PM                                    123

1             (Tape playing.)

2             MR. MASTER:  I'll play it once more.

3             THE WITNESS:  Do you need to -- go

4       ahead.

5             (Tape playing.)

6    BY MR. MASTER:

7      Q.   So the dispatcher said "Units on lower

8    Spring or by the walkway," and what was the

9    response that you got?

10     A.   My best interpretation is that's Officer

11   Bernegger saying, "34.  Lower Spring, uh, right by

12   D&S."

13     Q.   Thank you.

14       Now, the next part is -- the dispatcher

15   says, "Okay.  You got that under control."

16     A.   Okay.

17     Q.   I'll play it once more.

18     A.   Yeah, please.

19           (Tape playing.)

20   BY MR. MASTER:

21     Q.   Any luck?

22     A.   It sounds like Officer Bernegger saying,

23   "We have five officers."

24           MR. TALLBERG:  Or it could be "by in

25      large."

1             THE WITNESS:  One or the other.

2             (Tape playing.)

3    BY MR. MASTER:

4     Q.   Does that sound like another break in tape

5    right after that?

6     A.   It does.

7     Q.   Okay.

8           (Tape playing.)

9    BY MR. MASTER:

10     Q.   The dispatcher just said, "Units with the

11   suspect."  Then an officer said what sounded

12   like, "We have the party.  We have the bag with the

13   jacket and everything."

14       Do you know who said that?

15     A.   I do.

16     Q.   Who is that?

17     A.   Myself.

18     Q.   Okay.  I just want to play a small bit

19   more.

20          (Tape playing.)

21   BY MR. MASTER:

22     Q.   Just to read into the record, the

23   dispatcher said, "Okay.  Just be advised that the

24   complainant said there was a small amount of cash

25   and he took everything out of the register."  And

# Exhibit C

1          MR. TALLBERG:  Now that the question
2     is answered, could I ask for just a
3     minute, not a five-minute break with my
4     client.
5          MR. MASTER:  Not a problem.  If you
6     want a break we have been going for about
7     an hour.
8          MR. TALLBERG:  Okay.
9          MR. MASTER:  All right.  Let's do
10     that.
11          (THEREUPON, THERE WAS A RECESS
12     TAKEN.)
13          MR. TALLBERG:  If I may something for
14     the record.
15          There's something that Detective
16     Deeley would like to correct for the
17     record if you would allow him.
18          MR. MASTER:  Of course.  Are we on
19     the record now?
20          COURT REPORTER:  Yes.
21     A     It was brought to my attention that there
22     was -- obviously there was recordings from dispatch
23     which I never heard and I was off duty.
24          I was called in.
25

1     BY MR. MASTER:
2     Q     You were.  Okay.  You were called in.
3          When you were off duty, was there a
4     particular place where you would usually be?
5     A     Correct.
6     Q     Where would that be?
7     A     My apartment at that time.
8     Q     Okay.  Actually, before I move on and ask
9     you:  How did you remember or you said it was called
10     to your attention?
11     A     Correct.
12     Q     That you were off duty.
13          Okay.  And without -- you are saying it
14     was called to your attention during the break?
15     A     Correct.
16     Q     Okay.  Did you actually listen to the
17     police dispatch during the break?
18     A     No.
19          Nor have I ever listened to it.
20     Q     Okay.  So you -- did you being told that
21     refresh your own recollection that you were on break
22     at the time or you were off duty at the time?
23     A     No.
24     Q     Okay.  So you don't -- you actually don't
25     recall being off duty at the time and in your

1     apartment at -- on May 22, 2000, when the incident
2     took place?
3     A     Correct.
4          I remember getting to the incident.
5     Q     Okay.
6          MR. MASTER:  Could we go off the
7          record for a moment.
8          MR. TALLBERG:  Sure.
9          (THEREUPON, THERE WAS A DISCUSSION
10          OFF THE RECORD.)
11     BY MR. MASTER:
12     Q     So now having been informed you were off
13     duty when you received the or when you heard the
14     dispatch, where were you at the time that you
15     received the dispatch?
16     A     I was obviously called at home.
17     Q     Okay.  And your home, you actually don't
18     have to give me the exact home address, but -- well,
19     actually it would probably be helpful.
20     A     223 Meadow Street, Naugatuck, Connecticut.
21     Q     You don't have to give me the ZIP code.
22     A     Apartment-wise, I can't tell you.  It's a
23     three-floor apartment building, first floor being
24     all businesses.
25          I lived on both floors, the second and the

1     third so at the time I couldn't tell you which exact
2     floor I was on.
3     Q     Sure.  Is that address on the map or
4     location on the map?
5     A     No, it's not.
6          But I could explain it to you.
7     Q     I would appreciate if you could.
8     A     Here being 63 which we consider North
9     Church.
10     Q     When you say here you are pointing to the
11     south -- it's reverse for me -- southwest corner of
12     the map?
13     A     Correct.
14          I would be -- this is North Church.  North
15     Church going southbound runs into a four-way
16     intersection.
17          At that particular four-way intersection,
18     if you go left it turns into Church Street.  If you
19     proceed straight it is Meadow Street.  So from the
20     four-way intersection my apartment was maybe
21     250 yards down.
22     Q     Okay.  So it was quite close to the
23     four-way intersection.
24          So you are pointing to the southwest
25     corner.  Doesn't -- I'm now pointing to Bridge

1   Street which I guess runs from south to north
2   diagonally across the map.
3           Is that the four-way intersection you are
4   referring to, the intersection between Bridge Street
5   and 63 or there's another intersection past Bridge
6   Street?
7       A    Past Bridge Street proceeding towards
8   Church Street.
9       Q    Okay.
10      A    From Bridge Street and North Church Street
11  to the four-way intersection I would say under a
12  half a mile.
13           MR. TALLBERG:  For the record, I
14           think Bridge Street is more generally
15           east/west rather than true north/south.
16      A    Correct.
17  BY MR. MASTER:
18      Q    Okay.
19      A    63 runs north and south and Bridge runs
20  east and west.
21      Q    Just to clarify, is this satellite map a
22  due north and south map or is it -- can you tell
23  whether it's angled?
24      A    Depends on which particular street you
25  want to point out.

1       Q    I just mean is the satellite -- if I'm
2   pointing to the top of the map is that north and the
3   bottom of the map I'm pointing south?
4       A    Correct.
5       Q    So when I say Bridge Street it's running
6   diagonally, but it's running slightly more east/west
7   than north/south?
8       A    Correct.
9       Q    Now, when you -- at that time when you
10  were a canine officer and were off duty, did you
11  carry any radios, pagers, phones with you that
12  alerted you when there was a dispatch?
13      A    I was assigned a beeper.
14           I was assigned a radio.  And I also was
15  assigned a take home cruiser.
16      Q    Is it unusual to get a take home cruiser?
17      A    All your canine handlers have take home
18  vehicles.
19      Q    Okay.  And that was always your -- that
20  was your vehicle to use at all times?
21      A    Correct.
22      Q    Did anyone else -- was anyone else allowed
23  to use the vehicle?
24      A    No.
25      Q    Okay.  Do you know if that was because the

1   dog -- canine Argo viewed that particular vehicle as
2   his home?
3       A    That and it smelled pretty bad after a
4   while so I don't think too many other people wanted
5   a ride with me.
6       Q    It smelled kind of doggy?
7       A    Correct.
8       Q    Okay.  So understanding you have no
9   independent recollection of what happened when you
10  were at home when you receive the dispatch, did you
11  have a routine practice of carrying a pager or the
12  radio with you --
13      A    Correct.
14      Q    -- when you were at the house?
15      A    Correct.
16      Q    Okay.  Was it a hand held radio?
17      A    Yes.
18      Q    Okay.  Do you remember a specific radio
19  dispatch or page beeper page to you as the canine
20  officer?
21      A    Involving this incident?
22           No.
23      Q    Would it have been your habit or standard
24  of practice to listen to all dispatches while you
25  were home?

1       A    I always had the radio on, yes.
2       Q    You always had the radio on.  Okay.
3           And do you recall whether you -- you
4   specifically were mentioned in the dispatch or
5   whether there was in that dispatch a call for a
6   canine unit?
7       A    It was brought to my attention that an
8   officer actually called my residence to dispatch me.
9       Q    Okay.  When you say it was brought to your
10  attention, you mean it was brought to your attention
11  during the break that we just had?
12      A    Correct.
13      Q    Do you know which officer contacted you?
14      A    Officer Obar which I don't know if it was
15  the female Officer Obar we had or the male Officer
16  Obar that we currently still have.
17      Q    Oh, did you have a husband and wife team?
18      A    Correct.
19      Q    And was it brought to your attention,
20  then, that they actually, rather than contacting you
21  over the radio or the beeper, they actually called
22  your home?
23      A    It was brought to my attention that they
24  contacted me.
25           So I would assume it was preferably --

1  probably by phone.  I can only assume, though.

2      Q    So all of the officers had your -- well,

3  withdraw the question.

4           Do you know why Officer Obar either the

5  husband or the wife would have been the one to call

6  you?

7      A    They could have been in dispatch or they

8  could have been assigned.  No idea.

9      Q    Were they assigned to a special unit

10  themselves?

11     A    No.

12     Q    Were they supervisors?

13     A    No.

14     Q    Again, I understand this is difficult

15  because you don't have any independent recollection

16  of receiving this call.

17          But did you have a standard practice of

18  what you would do when you would receive a call from

19  an officer asking for assistance from a canine unit?

20     A    Yes.

21          And all calls came through -- they were

22  either told to contact me or whatever through a

23  supervisor.

24          And in this particular case, once again,

25  it was brought to my attention that Lieutenant

---

1  Scully was the one who requested the canine.

2      Q    When you say it was brought to your

3  attention, you mean it was brought to your attention

4  during break that Lieutenant Scully contacted

5  Officer -- one of the Officers Obar either directly

6  or contacted dispatch who contacted Officer Obar who

7  then called you?

8      A    That's what was brought to my attention,

9  yes.

10     Q    Okay.  Was Lieutenant Scully the shift

11  supervisor at the time?

12     A    Yes.

13          He was officer in charge.

14     Q    Okay.  So it was the standard of practice

15  at the time of the incident for an officer to call

16  you or page you at the direction of a shift

17  supervisor?

18     A    Correct.

19     Q    Would the shift supervisor ever call you

20  directly?

21     A    I'm sure it's happened.

22     Q    Okay.  But usually an officer was -- an

23  officer called you directly with the understanding

24  that the officer was directed by a shift -- well, I

25  don't want to put words in your mouth.

---

1           Did -- at the time when officers called

2  you when you were off duty, did they ever -- did

3  they tell you that they were authorized by a shift

4  supervisor?

5      A    Yes.

6           I would be told that canine was requested.

7  And then they would provide me with information on

8  where I need to be and what type of incident it was

9  involving.

10     Q    And they would let you know that the

11  dispatch was authorized?

12     A    Correct.

13     Q    Or was requested by a -- that it was

14  requested by someone who had authority to authorize

15  dispatch of a canine unit?

16     A    Correct.

17     Q    Okay.  Again, understanding that you don't

18  have any independent recollection of this, were you

19  informed during break about the content of this

20  specific communication that led you to leave your

21  apartment on May 22, 2000?

22          MR. TALLBERG:  I'll object to the

23          form of the question.

24          But you can answer.

25     A    No.

---

1  BY MR. MASTER:

2      Q    Do you recall at all what -- now having

3  had this conversation and been informed, do you

4  recall anything about that phone call that came in?

5      A    No.

6      Q    Okay.  Do you recall what you did after

7  you received the phone call?

8      A    I would assume I got immediately dressed

9  or depending what I was wearing that particular day

10  and grabbed the canine and went to -- headed towards

11  Anna Donte's.

12     Q    Do you remember if the call was about the

13  incident at Anna Donte's or if the call was about

14  the fleeing suspect?

15     A    No.

16          It would have been the Anna Donte's.

17     Q    Okay.  You say you would get dressed.

18  Does that mean that every time you were off duty --

19  I would assume you weren't wearing your -- I don't

20  want to assume anything.

21          Would you wear your police uniform while

22  you were off duty?

23          MR. TALLBERG:  Object to form.

24  BY MR. MASTER:

25     Q    As a usual practice?

2/10/2006 Deeley, Bart C.

1    A    Depends if I was training the dog, running
2    tracks myself.
3         So it depends what I was actually doing.
4    Q    So when you were training the dog outside
5    you would wear your uniform?
6    A    Correct.
7    Q    And when you were running track -- tracks
8    yourself you would also wear a uniform?
9    A    Correct.
10        To identify myself with other people, you
11   know, in parks or something like that.
12   Q    Okay.  If you were not wearing your
13   uniform at the time you received this call on
14   May 22, would you have put your uniform -- was it
15   your usual practice to put your uniform on before
16   you responded to a call while you were off duty?
17        MR. TALLBERG:  Object to the form.
18   A    Minimum I was required to wear a raid
19   jacket that had patches on each side upper arm
20   stating "Naugatuck Police."
21        And in the back, in big fluorescent
22   lettering, "Police" with a badge in the front of it.
23   And I would wear a baseball cap that had the
24   Naugatuck Police Department symbol on it.
25

6/16/2006 11:52 AM                                                    55

---

2/10/2006 Deeley, Bart C.

1    the ASP baton or the PR-24, the oleoresins or
2    Capstun, which is Ol-Cap (phonetic).
3         And I also would have ammunition on my
4    duty belt, my radio and my firearm.
5    Q    What type of firearm was it?
6    A    We switch so much.
7         I know we carried a 99 Smith and Wesson.
8    It might have been the sigma back then.  I'm not
9    sure.
10   Q    Okay.  Just to make sure I understand.
11        You are not sure whether you were wearing
12   your uniform or the rain jacket and the cap, but you
13   are sure you would have been wearing your duty belt?
14        MR. TALLBERG:  Just if I may object
15        to the form.
16        And I believe it's a raid jacket, not
17        a rain jacket.
18   BY MR. MASTER:
19   Q    Raid?
20   A    Correct.
21        MS. AMANKULOR:  R-a-i-d.
22   A    Correct.
23   BY MR. MASTER:
24   Q    As in when you are raiding a house or --
25   A    Correct.

6/16/2006 11:52 AM                                                    57

---

2/10/2006 Deeley, Bart C.

1    BY MR. MASTER:
2    Q    Okay.  So that would be a way for you to
3    identify yourself even if you didn't put on your
4    entire uniform?
5    A    Correct.
6    Q    And would you put that outfit on if you
7    didn't have time to put on your whole uniform?
8         MR. TALLBERG:  Object to the form.
9    A    I can't answer that.
10   BY MR. MASTER:
11   Q    Okay.  Do you remember what you did in
12   connection with this particular incident?
13        Did you put on your entire uniform.
14        Or do you remember what you put on?
15   A    I don't remember what I put on.  I can
16   assume I had my full duty gear, my duty belt.
17        And it would have either been my assigned
18   uniform which was BDUs at the time or I would have
19   put on the raid jacket with the ball cap.
20   Q    When you put on the rain jacket with the
21   ball cap would you also put on your duty belt?
22   A    Yes.
23   Q    What was on the duty belt?
24   A    On the duty belt, I'm not sure when we
25   switched to the ASP, so it would have either been

6/16/2006 11:52 AM                                                    56

---

2/10/2006 Deeley, Bart C.

1    Q    Thank you.
2         I don't know if it's bad weather out.  You
3    want to be prepared.
4         Okay.  Thank you.
5         Is there anything else that was brought to
6    your attention during break that would change what
7    you've told already me?
8    A    Just the fact that I thought I was on
9    duty.
10   Q    Okay.  So nothing else?
11   A    No.
12   Q    Okay.  Let's go back to the document, I
13   guess, that's marked Exhibit 3, Canine Unit, dated
14   6/22/97.
15        And thank you for clarifying what had
16   happened or at least bringing that to my attention.
17        So then could you read the paragraph
18   number six into the record on page three.
19   A    Page three, paragraph six.  "An off-duty
20   canine team should be dispatched to a potential
21   canine use situation as soon as possible.
22        "The authorization for calling an off-duty
23   canine team will come from the shift supervisor.  If
24   they are not available, the sergeant can authorize
25   the canine use.  Once a canine handler is dispatched

6/16/2006 11:52 AM                                                    58

1   to a potential use situation, he is on duty."
2       Q    Okay.  Was that policy followed in this
3   incident?
4       A    Correct.
5       Q    Could you just explain for the record why
6   it was followed?
7       A    The authorization came from Lieutenant
8   Scully which would have been the officer in charge.
9       Q    Okay.  Meaning the shift supervisor?
10      A    Correct.
11      Q    Okay.  And it says, the last sentence that
12  you said, "Once a canine handler is dispatched to a
13  potential use situation he's on duty."
14           What does that mean?
15      A    It means that I'm -- I'm on duty.
16           I'm governed under the policies and
17  procedures in the police department.
18      Q    Okay.  So before you were dispatched you
19  were not or you were off duty.
20           When do you begin to be on duty, the
21  moment that you receive a call?
22      A    Correct.
23      Q    Okay.  All right.  Let's put that aside
24  for a moment.
25           You can leave it with you.  I might ask

1   you a couple questions later.
2           So, again, let's go back to the scene.
3   You said that you were driving looks like northeast
4   on Bridge Street and you made a left onto Spring
5   Street and how far down Spring Street did you go?
6       A    I would say approximately two vehicle
7   lengths.
8       Q    Okay.  Why did you stop where you did?
9       A    Cruisers were pretty much flooded the area
10  and I also stopped any traffic coming from Bridge
11  onto Spring.
12      Q    So you stopped -- you stopped the traffic
13  that was going from Bridge onto Spring?
14      A    By positioning my cruiser the way I did,
15  yes.
16      Q    How did you position your cruiser?
17      A    I would have went in pretty much tried to
18  go parallel as best as I could.
19           So I would pull up -- I turned the wheel
20  to the right.  I would assume right or left, but I
21  would assume probably the right.  And then exited
22  the cruiser.
23      Q    So, in other words, you were -- you
24  positioned your vehicle so that it was basically
25  across both lanes of traffic on Spring Street?

# Exhibit D

1    Q    Is the intention when you use this
2  technique to hurt the individual's ankle?
3            MR. TALLBERG:  Object to the form.
4            You can answer.
5    A    The intent is to cause pain which will
6  cause him to comply.
7  BY MS. AMANKULOR:
8    Q    Okay.  So now I want to talk about the
9  actual day in question.
10           You're here because you were involved in
11 Mr. Bookless's arrest.
12           Is that correct?
13           MR. TALLBERG:  Object to the form.
14           He's here because he was commanded to
15           be here by a notice of deposition.
16 BY MS. AMANKULOR:
17   Q    Okay.  You were involved with the arrest
18 with Mr. Bookless on May 22, 2000?
19   A    Yes.
20   Q    Can you remember -- can you tell me how
21 you became involved?
22   A    I was in the area riding with another
23 officer when I heard the call come over dispatch --
24 from dispatch over the radio.
25   Q    And who were you riding with?

1    Q    And "here," you mean south of the --
2    A    It would be south on Route 63.  Route 63
3  is right there on the map.
4    Q    And do you know approximately how far that
5  is from where the arrest took place?
6    A    I believe the arrest, if I'm reading the
7  map right --
8            MR. TALLBERG:  No, you're not.
9            THE WITNESS:  No, I'm not?
10           MR. TALLBERG:  Here's Spring Street.
11   A    There you go.
12           Maybe a mile, if that.
13 BY MS. AMANKULOR:
14   Q    Okay.  So what did you hear on the radio?
15   A    That we had an armed robbery at Anna
16 Donte's with a knife.
17   Q    And do you recall who was speaking on the
18 radio?
19   A    I believe that it was Sergeant Smolicz and
20 Lieutenant Scully.
21   Q    Both of them?
22   A    I believe so.
23   Q    Did you get two separate radios?
24           MR. TALLBERG:  Object to form.
25   A    We only have one radio.

1    A    Officer Schofield.
2    Q    And where you driving?
3    A    I don't recall.
4    Q    Do you remember where you were?
5    A    When the call came in, at the corner of
6  Meadow and Church.
7    Q    All right.  I'm going to introduce --
8            MS. VALENTINE:  Plaintiff's 4.
9  BY MS. AMANKULOR:
10   Q    I'm going to point you to Plaintiff's 4.
11           Do you recognize this?
12   A    Yes.
13   Q    What is this?
14   A    It's an overlay of Naugatuck, the area
15 where Anna Donte's is and the police station is.
16   Q    So can you point to me where you were when
17 you received --
18   A    It's not on the map.
19   Q    It's not on the map?
20   A    It's over there somewhere.
21           MS. VALENTINE:  By "over there --
22 BY MS. AMANKULOR:
23   Q    By "over there," you mean --
24   A    It would be somewhere over here if the map
25 extended.

1  BY MS. AMANKULOR:
2    Q    I'm sorry.  You said that you heard
3  Sergeant Smolicz as well as Lieutenant Scully on the
4  radio.
5            Is that correct?
6    A    Yes.
7    Q    Did you hear them at different times?
8    A    Yes.
9    Q    Do you remember who you heard first?
10   A    No.
11   Q    When you heard Lieutenant Scully radio, do
12 you remember what he said?
13   A    I believe he's the one that told us that
14 there was a knife involved.
15   Q    So how did you know to go to the location
16 where Mr. Bookless was eventually arrested?
17   A    Lieutenant Scully was leaving the police
18 department and, upon him leaving the police
19 department and going down the road, he radios in
20 that he was in a foot pursuit.
21   Q    And so you heard that over the radio?
22   A    Yes.
23   Q    And then what did you do?
24   A    We proceeded to go to where Lieutenant
25 Scully was.

1    Q    And what did Lieutenant Scully say?

2    A    I don't remember exactly what he said.  I

3    can just tell you that everybody converged over

4    there because whenever we have a foot pursuit and

5    you're in the area, you want to go help.

6    Q    So did you get two radio messages from

7    Lieutenant Scully or just --

8    A    There was -- there was the original

9    message coming from dispatch.  And I'm assuming that

10    Sergeant Smolicz and Lieutenant Scully were both in

11    dispatch.  You'll have to ask Lieutenant Scully on

12    that.

13    But, once that ended, Lieutenant Scully

14    left the building to go over to Anna Donte's, I

15    would imagine, because that would be, you know, the

16    right way to go.

17    Q    So the first radio that you heard was that

18    there had been a robbery at Anna Donte's?

19    A    Right.

20    Q    And what did that radio tell you?

21    What did you know?

22    A    Just that that there was an armed robbery

23    at Anna Donte's.  It gave us a brief description of

24    the person and that he had a knife.

25    Q    So what did you do when you heard that

1    tell me?

2    A    I honestly do not remember, you know.  I

3    would imagine that it would be right down Bridge

4    Street and turn onto Spring.  That would be the most

5    direct route.

6    Q    So do you think that you were going north

7    on Spring Street?

8    A    At the time that he called?

9    Q    When you were -- when you were driving to

10    the scene, do you think you were driving north on

11    Spring Street?

12    A    Not when I got that call.  I was probably

13    on Bridge Street by that time.

14    Q    I'm sorry, I'm not being clear.

15    How did you approach the scene, I guess is

16    my question?

17    You drove onto Spring Street?

18    A    Right.

19    Q    And which way were you driving?

20    A    I believe it would have been north.

21    Q    Are radios between officers recorded?

22    A    Yes.

23    Q    And what happens to those recordings?

24    A    They get held.

25    Q    For how long?

1    first radio come in?

2    A    I believe I asked permission to go into

3    the area.

4    Q    So did you start driving into Anna

5    Donte's?

6    A    I don't recall, but that would be the

7    thing to do.  That would be what we would do is go

8    into the area.

9    Q    So then at a later point you heard the

10    radio from Lieutenant Scully regarding the foot

11    pursuit?

12    A    Right.

13    Q    And do you have any idea how much time

14    passed between the first radio and the second?

15    A    I have no idea.

16    Q    What did Lieutenant Scully's radio say?

17    A    Basically that somebody -- I mean, you

18    would have to listen to the radio verbatim but, from

19    what I remember, just that he had somebody running

20    on him that fit the description.

21    Q    And so at that point, you started driving

22    to the scene?

23    A    Toward Lieutenant Scully.

24    Q    And how did you approach the scene?

25    How did you drive there, if you could just

1    A    I don't know.  You would have to ask --

2    MR. TALLBERG:  If you don't know, you

3    don't know.

4    But, for the record, we have produced

5    a copy of the audio recordings to Attorney

6    Master.  You should have them.

7    MR. MASTER:  Could we go off the

8    record for a second?

9    MR. TALLBERG:  Sure.

10    (THEREUPON, THERE WAS A DISCUSSION

11    OFF THE RECORD.)

12    BY MS. AMANKULOR:

13    Q    So where did you park -- where did you

14    park when you got to the scene?

15    A    It would be right at lower Spring where --

16    right before the dirt parking lot where Bookless was

17    apprehended.

18    Q    And how did you know to stop there?

19    What did you see?

20    A    Cruisers, police cars.

21    Q    How many police cars did you see?

22    A    I don't recall at this time.

23    Q    And what was the -- what did you do when

24    you arrived?

25    A    Looked for the lieutenant.

# Exhibit E

2/9/2006 Walsh, Raymond

1           The whole incident or the arrest itself?
2   BY MS. VALENTINE:
3       Q    The whole incident from the time you
4   arrived at the scene until Mr. Bookless was in
5   custody?
6       A    I guess as good as could be expected.
7       Q    Okay.  How did you -- let's talk about
8   your arrival at the scene.
9            What were you doing in the half hour or so
10  before you arrived at the scene?
11      A    Sitting at my desk.
12      Q    So you were in the police station?
13      A    Correct.
14      Q    And were you on -- you were on duty?
15      A    Yes.
16      Q    And where is the police station in
17  Naugatuck again?
18      A    211 Spring Street.
19      Q    Spring Street.
20           And how did you -- was there a point that
21  you came to leave your desk?
22      A    Yes.
23      Q    And what prompted you to do that?
24      A    That we heard over the radio that a
25  business in town, Anna Donte's on North Main Street,

6/18/2006 11:43 AM                                              33

---

2/9/2006 Walsh, Raymond

1   had been robbed.
2       Q    And you heard on the radio, you said?
3       A    Part of it comes over the radio, part of
4   it comes from the interdepartment paging system
5   whether they're asking for us to go or asking us
6   "Did you hear that?  Are you guys going?"
7            I mean, it could have been a couple
8   different ways to get us going.
9       Q    Do you remember in this particular
10  situation what way it was?
11      A    No.
12      Q    And how many other officers were in the
13  police station at the the time?
14      A    I have no idea.
15      Q    If you remember?
16      A    (The witness shakes head.)
17      Q    And was there any particular reason why
18  you went as opposed to somebody else?
19      A    No.
20      Q    So what did you do next?
21           You heard on the radio there had been a
22  robbery?
23      A    Myself and the sergeant -- it could be so
24  many different things.
25           We just ran out and started heading down

6/16/2006 11:43 AM                                              34

---

2/9/2006 Walsh, Raymond

1   toward the business.
2       Q    And you said the sergeant?
3       A    Correct.
4       Q    Who is that?
5       A    Robert Allen.
6       Q    Robert Allen.
7            And you left the police station on foot?
8       A    With the car.  We left the building to our
9   car.
10      Q    You left --
11      A    To our car, yes.
12      Q    And did you and Sergeant Allen drive
13  together?
14      A    Correct.
15      Q    Where did you drive?
16      A    To Anna Donte's.
17      Q    You went to the restaurant?
18      A    Correct.
19      Q    I'm going to show you -- I don't know if
20  it shows Anna Donte's, but I'm going to show you a
21  map that we printed off of Google.
22           Does that map look like a simple but an
23  accurate map of the general area?
24      A    Yes.
25           MR. TALLBERG:  If I could just

6/16/2006 11:43 AM                                              35

---

2/9/2006 Walsh, Raymond

1           clarify for the record.
2           Was that a question about the
3           question of the location of Anna Donte's?
4           MS. VALENTINE:  No, it's not a
5           question about Anna Donte's.
6           But it's about the area in which the
7           police station is generally in and the
8           area in which the arrest generally took
9           place.
10          Jim, do you want a copy of that?
11          MR. TALLBERG:  Sure.
12          THE WITNESS:  It actually looks
13          pretty bad now that I'm looking at the
14          walk bridge.
15  BY MS. VALENTINE:
16      Q   You think the walk bridge is poorly --
17          MR. TALLBERG:  Could we go off the
18          record for a minute?
19          MS. VALENTINE:  Sure.
20          (THEREUPON, THERE WAS A DISCUSSION
21          OFF THE RECORD.)
22          MR. TALLBERG:  Back on the record.
23          I have a map from the Naugatuck
24          Engineering Department.  It was printed
25          October 31, 2005.  It is my understanding

6/16/2006 11:43 AM                                              36

1      that it is a satellite photo taken
2      sometime prior but after the May 2000
3      incident.
4           I intend to offer a version of this
5      at trial, so I'm making it available to
6      counsel today for the deposition if you
7      want to mark it for demonstrative
8      purposes.
9           MS. VALENTINE:  And I think what
10     we'll do is take back the map we had just
11     previously shown Detective Walsh, and
12     we'll mark this satellite photo map as
13     Plaintiff's Exhibit 4.
14          MR. TALLBERG:  Yes.
15          (THEREUPON, PLAINTIFF'S EXHIBIT NO.
16          4, SATELLITE PHOTO MAP, WAS MARKED
17          FOR IDENTIFICATION.)
18  BY MS. VALENTINE:
19     Q    So, Detective Walsh, you said you and
20  Sergeant Allen got in a cruiser, and which way did
21  you drive?
22          You left the station on Spring Street?
23     A    Correct.
24     Q    And from there, you drove to Anna Donte's?
25     A    Correct.

1      A    I don't remember.  I'm sure there was.
2      Q    Do you remember whether you were given a
3  description of the suspect?
4      A    I don't remember.
5      Q    Do you remember whether you were told if a
6  weapon was used in the incident?
7      A    I don't remember.
8      Q    And so you arrived at the restaurant.
9           Is that right?
10     A    Correct.
11     Q    And what happened when you got to the
12  restaurant?
13          What did you do?
14     A    Started interviewing, looking around,
15  seeing, according to the two complainants, what
16  actually took place and what happened, and just
17  normal -- normal detective stuff.
18     Q    You said there were two complainants?
19     A    Correct.
20     Q    Do you remember their names?
21     A    I did until you just asked me.
22          I would have to look at the report.
23     Q    Were they women?
24     A    Yes.
25     Q    Do you remember what they told you?

1      Q    And what route did you take?
2      A    The most direct.
3      Q    Do you remember what that was?
4      A    I would hope -- I don't remember, but I
5  can tell you how I would drive it if it was today.
6      Q    Okay.  That would be fine.
7      A    A left onto Bridge Street, over the 68
8  bridge, a right onto Union Street, a right onto
9  North Main Street, and Anna Donte's was right there.
10     Q    And you said a left onto Bridge Street.
11          Would that be off of Spring Street?
12     A    Correct.
13     Q    As you were driving that day, the day of
14  the arrest, do you remember seeing anything unusual?
15     A    On the way to?
16     Q    On the way to Anna Donte's?
17     A    No.
18     Q    What prompted you to go to the restaurant
19  itself?
20     A    Because that's where the crime was
21  committed.
22     Q    And you knew that from the dispatch?
23     A    Correct.
24     Q    Was there any other information provided
25  to you in the dispatch?

1      A    No, I don't remember what they told me
2  while I was there at the scene six years ago, no.
3      Q    Do you remember asking -- would you have
4  asked them to describe the suspect?
5      A    Yes.
6      Q    Do you remember that happening?
7      A    No, I don't.
8      Q    Do you remember how long you stayed at the
9  restaurant, in the nearby vicinity to the
10  restaurant?
11     A    No, I don't.
12     Q    What prompted you to leave the scene?
13     A    Lieutenant Scully -- and I don't know if
14  it was calling for help or just the way the radio
15  transmission came over or actually who made the
16  radio transmission, but it was something that
17  prompted both myself and Sergeant Allen to leave and
18  head that way.
19     Q    So you heard a radio transmission?
20     A    Correct.
21     Q    Is that a radio you would have been
22  carrying on your person?
23     A    Correct.
24     Q    And you said you don't remember who made
25  the radio transmission?

2/9/2006  Walsh, Raymond

```
1       A    Correct.
2       Q    Do you think it was Lieutenant Scully?
3       A    I'm sure some of it was.
4       Q    So it may have been more than one voice
5    over the radio?
6       A    Could have been.
7       Q    So you heard the radio and you and
8    Sergeant Allen did what?
9       A    Started heading back toward what we
10   thought was the area we thought Lieutenant Scully
11   was at.
12      Q    How did you know that?
13           Were you given the location?
14      A    By the radio transmissions.
15      Q    Do you remember anything about what was
16   said on the radio?
17      A    No.
18      Q    The tone, can you tell me a little bit
19   more what you remember about the tone?
20      A    No.
21      Q    I imagine you get a lot of radio
22   activity --
23      A    Six years of radio chatter.
24      Q    Right.  Okay.  And did you drive back on
25   the same route?
```

Exhibit F

***THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY***

Copyright 2003 National Data Registry, Inc., All Rights Reserved

CONNECTICUT CRIMINAL HISTORY RECORDS
ARCHIVED DEPARTMENT OF CORRECTIONS

Name:  BOOKLESS,JOSEPH  JOHNSTON

Date of Birth:  08/1951

Gender:  Male

Height (Ft-In):  5'10"

Weight (Lbs.):  185

Eye Color:  HAZEL

Hair Color:  BROWN

*****OFFENSE RECORD*****

Offense: ROBBERY, FIRST DEGREE
  Offense Severity: CLASS B FELONY
  Offense Date: 4/7/1981
  Statute Number: 53A134
  Case Number: 3-39050
  Sentence Date: 4/7/1981
  Sentence Length: 014 YR(S)

Offense: ROBBERY, FIRST DEGREE
  Offense Severity: CLASS B FELONY
  Offense Date: 11/17/1980
  Statute Number: 53A134
  Case Number: 4-90087
  Sentence Date: 7/28/1982
  Sentence Length: 014 YR(S)

Offense: ESCAPE, FIRST DEGREE
  Offense Severity: CLASS C FELONY
  Offense Date: 9/2/1990
  Statute Number: 53A169
  Case Number: 3-75203B
  Sentence Date: 10/23/1990
  Sentence Length: 001 YR(S)

Offense: ROBBERY, SECOND DEGREE
   Offense Severity: CLASS C FELONY
   Offense Date: 2/1/1991
   Statute Number: 53A135
   Case Number: CR4-190242
   Sentence Date: 11/22/1991
   Sentence Length: 010 YR(S)

Offense: CRIMINAL ATTEMPT
   Offense Date: 2/1/1991
   Statute Number: 53A049
   Case Number: CR4-190243
   Sentence Date: 11/22/1991
   Sentence Length: 010 YR(S)

Offense: ROBBERY, SECOND DEGREE
   Offense Severity: CLASS C FELONY
   Offense Date: 2/1/1991
   Statute Number: 53A135
   Case Number: CR4-190243
   Sentence Date: 11/22/1991

Offense: ASSAULT ON POLICE OR FIRE OFFICER
   Offense Severity: CLASS C FELONY
   Offense Date: 6/28/1996
   Statute Number: 53A167C
   Case Number: CR6-175855
   Sentence Date: 1/5/1998
   Sentence Length: 001 YR(S)

Offense: ROBBERY, FIRST DEGREE
   Offense Severity: CLASS B FELONY
   Offense Date: 5/22/2000
   Statute Number: 53A134
   Case Number: 04-290382A
   Sentence Date: 6/12/2002
   Sentence Length: 025 YR(S)

Offense: PERSISTENT OFFENDER
   Offense Severity: FELONY
   Offense Date: 5/22/2000
   Statute Number: 53A040
   Case Number: 04-290382A
   Sentence Date: 6/12/2002

Offense: INTERFERING WITH AN OFFICER
   Offense Severity: CLASS A MISDEMEANOR
   Offense Date: 5/22/2000
   Statute Number: 53A167A
   Case Number: 04-290382A
   Sentence Date: 6/12/2002
               Sentence Length: 001 YR(S)

*****INCARCERATION RECORD*****

RECORD 0001
Incarceration Date: 4/7/1981
Sentence Length: 014 YR(S)
Tentative Release Date: 1/13/1989
RECORD 0002
Incarceration Date: 7/28/1982
Sentence Length: 014 YR(S)
Tentative Release Date: 12/28/1990
RECORD 0003
Incarceration Date: 10/23/1990
Sentence Length: 001 YR(S)
Tentative Release Date: 10/23/1991
RECORD 0004
Incarceration Date: 11/22/1991
Sentence Length: 010 YR(S)
Tentative Release Date: 11/21/2001
RECORD 0005
Incarceration Date: 11/22/1991
Sentence Length: 010 YR(S)
Tentative Release Date: 11/21/2001
RECORD 0006
Incarceration Date: 1/5/1998
Sentence Length: 120 DAY(S)
Tentative Release Date: 10/31/1999
RECORD 0007
Incarceration Date: 6/12/2002
Sentence Length: 025 YR(S)
Tentative Release Date: 6/11/2027